**Affirmed and Opinion filed December 15, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-10-00708-CV

---

**THE PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS, Appellant**

**V.**

**ZACHRY CONSTRUCTION CORPORATION N/K/A ZACHRY INDUSTRIAL, INC., Appellee**

---

**On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2006-72970**

---

## O P I N I O N   O N   R E M A N D

This contract dispute is before our court for a second time, on remand from the Texas Supreme Court. *See Port of Houston Auth. of Harris Cty. v. Zachry Constr. Corp.*, 377 S.W.3d 841, 844 (Tex. App.—Houston [14th Dist.] 2012), *rev'd, Zachry Constr. Corp. v. Port of Houston Auth of Harris Cty.*, 449 S.W.3d 98, 101 (Tex. 2014). Zachry Construction Corporation n/k/a Zachry Industrial,

Inc. (Zachry) sued the Port of Houston Authority of Harris County, Texas (the Port) for breach of contract. Following a three-month jury trial, the trial court signed a final judgment awarding Zachry damages of $19,992,697, plus pre- and post-judgment interest. On remand from the Texas Supreme Court, numerous challenges to the trial court's judgment remain. We affirm.

## I. Background

In 2003, the Port solicited bids to construct a wharf at the Bayport Ship Channel. The wharf consisted of five sections, each approximately 330 feet in length. Zachry's bid proposed building the wharf "in the dry" by using a U-shaped, frozen earthen wall to seal out water from Galveston Bay from the construction site. Zachry proposed to freeze the wall by sinking 100–foot pipes into the wall and circulating chilled brine through the pipes. Then, Zachry would install drilled shafts into the ground, pour a concrete deck on top of the drilled shafts and dirt using the ground as the bottom of the concrete form, excavate the dirt under the deck, and place revetment to stabilize the slope. After completing the wharf, Zachry would breach the freeze wall, flooding the area, and remove the remainder of the freeze wall so that ships would be able to dock at the wharf and unload their cargo.

An advantage of working "in the dry" instead of "in the wet" was that fewer "NOx" emission credits would be consumed. The Port accepted Zachry's bid in large part because of the environmental benefits of using the freeze wall. On June 1, 2004, Zachry entered into the Bayport Phase 1A Wharf and Dredging Contract (the Contract) with the Port for the construction of a 1,660–foot wharf. The Port had concerns about the possible impact of the frozen soil on adjacent structures but provided in the Contract that Zachry would be an independent contractor and control the means and methods, thus "insulating itself from liability to which it

2

would be exposed were it exercising control over Zachry's work." *Zachry Constr. Corp.*, 449 S.W.3d at 102.

The Port designated Steve DeWolf as the Chief Engineer for the project. The Port additionally hired CH2M Hill as its construction manager; Andy Thiess was CH2M Hill's engineer/construction manager, while Jeff Ely was CH2M Hill's engineer/design manager for this project. Zachry designated Andy Anderson as its Project Manager and hired RKK–SoilFreeze Technologies to work on the freeze wall. RKK in turn, hired Dan Mageau of GeoEngineers, a geotechnical engineer, to design the freeze wall.

The Contract provided a strict timeline. Specifically, Zachry was to complete construction of the wharf by June 1, 2006. Zachry was also to meet an interim deadline of February 1, 2006—Milestone A—by which a portion of the wharf would be sufficiently complete to allow delivery of large ship-to-shore cranes that were to be shipped from China. The Contract also provided that Zachry's sole remedy for any delay on the project was an extension of time.

Nine months into the project, the Port realized that it would need longer berths to accommodate the ships it expected to service. In March 2005, the Port decided to extend the original wharf Zachry was constructing by 332 feet. Zachry submitted price quotes for the wharf extension on April 13, May 18, and July 11, and described its plan during meetings with, among others, Thiess and Ely. Zachry's proposal was based on using the freeze-wall technology to add this additional footage to the wharf. Zachry had Mageau design a frozen cutoff wall, a perpendicular wall to the main freeze wall, to split the project into two phases: a west side including Area A and an east side, as had been discussed at meetings prior to Zachry's submission of its price quotes. On September 9, Zachry sent the frozen cutoff wall design to the Port for "review," not "approval." The Port and

Zachry executed Change Order 4 for the wharf extension on September 27, *after* Zachry had submitted its frozen cutoff wall design to the Port. Change Order 4 extended the dates for Milestone A to February 15, 2006, and final completion to July 15, 2006. Change Order 4 incorporated Zachry's April 13 proposal as further modified by the May 18 and July 11 proposals.

After entering into Change Order 4, the Port refused to approve Zachry's frozen cutoff wall design and sent Zachry a "revise and resubmit" response (R&R response). In this R&R response, the Port noted preliminary indications that the design may have an indeterminate effect on up to fourteen shafts and directed Zachry either to "present [an] alternative cutoff wall design" or to "present the Port of Houston with an alternate means of mitigating risk" to the shafts. Ultimately, in late November 2005, after finding no viable alternative to the frozen cutoff wall design that would allow it to meet the Contract deadlines, Zachry abandoned the frozen cutoff wall and switched to an "in the wet" scenario. Zachry, working in the wet, managed to complete the Area A section of the wharf in time to accommodate the arrival of the shipment from China.

In late 2006, Zachry sued the Port for breach of contract, by failing to comply with Change Order 4 and section 5.10 of the Contract through the Port's R&R response. As damages, Zachry sought the difference between the cost that Zachry would have incurred had it been allowed to complete the wharf "in the dry" using the frozen cutoff wall and the actual cost Zachry incurred in completing the wharf "in the wet" without the frozen cutoff wall. Zachry also sued the Port for withholding liquidated damages for delays in the amount of $2.36 million, and for the Port's withholding of $600,000 as a purported offset for alleged defective dredging. The Port filed a counterclaim for attorney's fees under section 3.10 of the Contract, which provided that Zachry was liable for the Port's attorney's fees if

Zachry brought a "claim" against the Port and "d[id] not prevail with respect to such claim." Over two years after suing the Port, Zachry declared the wharf complete on January 26, 2009.

After a three-month trial, the case was submitted to the jury. The jury found that the Port had breached the Contract by failing to comply with Change Order 4 and section 5.10, and found compensatory damages in the amount of $18,602,697 for the Port's breach of the Contract. These damages represented Zachry's increased costs for switching to working "in the wet." The jury did not find that the Port failed to comply with the Contract by withholding $600,000 from the Port's payment on the amounts invoiced by Zachry for defective dredging.

The trial court instructed the jury that the Port had not complied with the Contract by failing to pay Zachry $2.36 million withheld as liquidated damages. Thus, the jury needed only to determine whether the Port was entitled to offset; the jury found for the Port on an offset defense in the amount of $970,000 for Zachry's defective work on the wharf fenders.

In its final judgment, the trial court awarded Zachry damages in the amount of $19,992,697.00 ($18,602,697.00 plus $2,360,000.00 in liquidated damages, less the $970,000.00 offset for the defective fenders), pre-judgment interest of $3,451,022.40, post-judgment on the total sum award of $23,443,719.00, and taxable costs. The trial court did not award the $600,000.00 withheld for defective dredging that the jury refused to award Zachry and did not award attorney's fees to the Port.

On direct appeal, we held that the no-damages-for-delay provision of the Contract barred Zachry's recovery of delay damages, that Zachry unambiguously released its claims to $2.205 million of the liquidated damages withheld, that the Port was entitled to the $970,000 found by the jury for the defective wharf fenders,

5

and that the Port was entitled to attorney's fees under the Contract. *See Port of Houston Auth.*, 377 S.W.3d at 850–51, 857–58, 861. We reversed the judgment in favor of Zachry and rendered judgment for the Port. *See id.* at 865. However, the Supreme Court of Texas reversed this court, holding that (a) the Local Government Contract Claims Act waived the Port's immunity to suit—an issue that this court had not reached; (b) the no-damages-for-delay provision of the Contract was void and unenforceable as against public policy due to the Port's arbitrary and capricious conduct, active interference, bad faith and/or fraud; (c) Zachry did not release its claims to the withheld liquidated damages; (d) the evidence was sufficient to support the jury's finding that the Port was entitled to the $970,000 offset for defective wharf fenders; and (e) the Port was not entitled to attorney's fees. *See Zachry Constr. Corp.*, 449 S.W.3d at 113–14, 116–18, 119–20. The supreme court remanded to this court to address the Port's remaining issues.

The Port submitted supplemental briefing, urging the following issues it contends are outstanding: (1) the liability findings fail as a matter of law; (2) the damages finding fails as a matter of law; (3) Zachry's "but-for" causation theory fails as a matter of law;[1] (4) Zachry's R&R claim fails as a matter of law because Zachry did not satisfy contractual conditions precedent; (5) the trial court wrongly

---

[1] The Port asserts it is challenging the factual sufficiency of the evidence, as well as the legal sufficiency, in its first three issues  However, in its briefing, it urges repeatedly that there is "no evidence" to support these findings or that "as a matter of law" these findings fail. Thus, despite labeling its issues as challenges to the factual sufficiency of the evidence, the Port provides no argument in support of a factual sufficiency challenge. Indeed, the Port consistently urges that Zachry's R&R claim should be rendered. *See Dongsheng Huang v. Riverstone Residential Grp. (Alexan Piney Creek)*, No.14-11-00009-CV, 2011 WL 6003949, at *1 (Tex. App.—Houston [14th Dist.] Dec. 1, 2011, pet. denied) (mem. op.); *see also* Tex. R. App. P. 38.1(i); *Garden Ridge, L.P. v. Clear Lake Center, L.P.*, –S.W.3d–, No. 14-15-00695-CV, 2016WL 5497501, at *10 (Tex. App.—Houston [14th Dist.] Sept. 29, 2016, no pet. h.) ("Clear Lake Center does not refer to the standard of review, cite any other legal authority, or analyze the facts of the case under the appropriate legal authority in such a manner to demonstrate that the trial court committed reversible error."). We thus only consider the legal sufficiency of the evidence to support the jury's findings as to breach, causation, and damages.

excluded evidence of the Port's harms/losses caused by Zachry; (6) the trial court wrongly excluded this evidence of harms/losses even though Zachry opened the door to the evidence; (7) charge error in the fraud no-damages-for-delay exception requires a new trial; (8) the trial court improperly included apparent authority instructions in the jury charge; (9) because Zachry's R&R claim should be rendered, the Port is entitled to attorney's fees as found by the jury; and (10) Zachry erroneously recovered purported "pass-through" damages sustained by a Zachry subcontractor.[2] We address these issues in turn.

## II.  Liability

The Port couches its first issue as a challenge to the sufficiency of the evidence to support the jury's findings of liability against the Port.  Much of its argument concerns the jury's allegedly erroneous interpretation of various contractual provisions.  We thus begin our analysis of this issue by setting forth the appropriate standard of review for a legal sufficiency challenge and then turn to general principles governing contract interpretation.  Finally, we consider the sufficiency of the evidence to support the jury's finding in response to Question No. 2 that the Port failed to comply with section 5.10.

### A.    Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005); *United Nat'l Ins.*

---

[2] In a final issue, the Port asserts that the jury's answer of "No" to Question No. 9, which asked whether the Port breached the Contract by withholding $600,000 for defective dredging, was neither charge error nor against the great weight of the evidence.  Zachry did not respond or mention this cross-appeal issue in its post-remand supplemental briefing.  Indeed, in its prayer, it simply requests that the trial court's judgment be affirmed.  It appears that Zachry has abandoned its claim to this $600,000.  Accordingly, this issue presents nothing for our review.

7

*Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 6 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd). We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810; *United Nat'l Ins. Co.*, 447 S.W.3d at 6–7. If the evidence, viewed in the light most favorable to the verdict, would enable reasonable and fair-minded people to find the challenged fact, then the evidence is legally sufficient. *See City of Keller*, 168 S.W.3d at 822; *see also United Nat'l Ins. Co.*, 447 S.W.3d at 7.

Because the Port's first issue concerns the jury's findings based on its interpretation of the Contract, we review the general principles concerning contract interpretation. Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Bhatia v. Woodlands N. Houston Heart Ctr.*, 396 S.W.3d 658, 669 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *Bhatia*, 396 S.W.3d at 669–70. Whether a contract is ambiguous is a question of law for the court; when a contract is ambiguous, its interpretation becomes a fact issue for the jury to resolve. *Coker v. Coker*, 650 S.W.2d 391, 394–95 (Tex. 1983); *see Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (stating that a contract is ambiguous when its meaning is uncertain and doubtful or

is reasonably susceptible to more than one interpretation). Here, by instructing the jury to interpret certain provisions of the Contract and Change Order 4, the court determined that these provisions were ambiguous and left their interpretation to the jury to resolve. *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008) ("[B]y sending the interpretation of the [agreements] to the jury, the trial court implicitly held the [agreements] were ambiguous.").

Finally, because the damages finding was premised on the Port's liability under either Question No. 1, pertaining to Change Order 4, or Question No. 2, pertaining to section 5.10 of the Contract, we need only consider whether the Port failed to comply with either of these provisions. *See, e.g.*, *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 89–90 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). We thus focus on whether the Port failed to comply with section 5.10— the jury's finding in response to Question No. 2.

## B.    Application

We begin our analysis with the language of the charge, which informs the sufficiency of the evidence to support the jury's finding. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). In Question No. 2 the trial court provided the following question and instructions to the jury:

> Did the Port fail to comply with § 5.10 of the General Conditions?
>
> In answering this question, it is your duty to interpret §§ 5.10 and 5.22 and the terms contained therein.
>
> You must decide the meaning of these provisions of the Contract by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

9

In determining the meaning of these provisions, you may also consider a trade custom or usage, if any, if you find that such trade custom or usage existed. However, a trade custom or usage, if any, cannot vary, control, impair, restrict or enlarge the express language of the Contract. A trade custom or usage exists if it is a practice so generally or universally well known and used in the industry that the parties are charged with knowledge of its existence to such an extent as to raise the presumption that the parties contracted with reference to it.

Furthermore, in answering this question, you are instructed that nothing in § 5.41 gave the Port the right to issues its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Answer "yes" or "no."

The jury answered "yes" to this question.

We next discuss the relevant provisions of the Contract referenced in the charge. We begin with section 5.10, which provided the Port with insulation from liability:

5.10 <u>Independent Contractor</u>:

It is agreed between the parties that the Contractor is and shall be an independent contractor. Nothing in the Contract Documents shall create a relationship of employer and employee or principal and agent between the Port Authority, on the one hand, and the Contractor or any of its employees, Subcontractors, Suppliers or agents of any thereof, on the other hand. Neither the Contractor nor any of its employees, Subcontractors, Suppliers or agents shall have the ability to bind or obligate the Port Authority for any purpose whatsoever.

The Port Authority shall not have the right to control the manner in which or prescribe the method by which the Contractor performs the Work.[3] As an Independent Contractor, the Contractor

---

[3] "Work" is defined by the Contract as:

The construction and services required by the Contract documents, whether commenced or not, or completed or partially completed, and all labor, Materials, Equipment and services provided or to be provided by the Contractor to fulfill the

shall be solely responsible for the supervision of and performance of the Work and shall prosecute the Work at such time and seasons, in such order or precedence, and in such manner, using such methods as the Contractor shall choose; provided, however, that the order, time, manner and methods of prosecution shall be in compliance with Contractor's Standard of Care and Work shall be completed within the Contract Time and in accordance with the Contract Documents.[4]

This section of the Contract clearly contemplates that Zachry will control the "manner and methods" of its work. Indeed, the Supreme Court of Texas emphasized this fact in its opinion: "The contract made Zachry an independent contractor in sole charge of choosing the manner in which the work would be conducted. . . . [section 5.10] benefitted the Port, insulating it from the liability to which it would be exposed were it exercising control over Zachry's work." *Zachry Constr. Corp.*, 449 S.W.3d at 102. The court noted controlling authority, explaining that "'an owner or occupier does not owe a duty to ensure that independent contractors perform their work in a safe manner. But one who retains a right to control the contractor's work may be held liable for negligence in exercising that right.'" *Id.* at 102 n.4 (quoting *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008)).

Yet despite this Contract provision, the Port contends that it was entitled to reject Zachry's freeze-wall design and order Zachry to revise and resubmit its

---

Contractor's obligations pursuant to the Contract Documents. The Work may constitute the whole or a part of the Project.

[4] "Contract Documents" include

the Contract agreement signed by the Port Authority and Contractor, Addenda (if any), Contractor's Bid/Proposal (including documentation accompanying the Bid/Proposal and any post-Bid/Proposal documentation submitted and agreed to by the Port Authority prior to commencement of Work), the Bonds, Insurance Certificates, these General Conditions, Special Conditions, Specifications and Drawings, the Purchase Order, and Modifications.

"Submittals" are explicitly excluded from the Contract Documents, as noted *infra*.

11

proposed use of the frozen cutoff wall under section 5.22 of the Contract. This section, excerpted next, required that Zachry "submit" designs or plans to the Port prior to commencing certain "Work" under the contract:

5.22 <u>Submittals to be Furnished by the Contractor after Award</u>

The Contractor shall prepare, or cause to be prepared, and submit to the person indicated below for such person's review (which review shall be conducted with reasonable promptness so as not to delay the Work), complete design and detailed Shop Drawings, Product Samples, and other pertinent information showing all materials and details of Work to be incorporated into the Project. Contractor shall submit such Submittals:

(a) if there is no Design Consultant responsible for checking Submittals in connection with the Work, to the Chief Engineer with a copy of the transmittal therewith to the Inspector; or

(b) if there is a Design Consultant responsible for checking Submittals in connection with the Work, to such Design Consultant with copies of the transmittal letter transmitted therewith to the Chief Engineer and the Inspector.

*Submittals of a non-technical nature, such as the Contractor's health and safety plan, spill prevention plan, and appointment of Contractor's superintendent, shall always be submitted to the Chief Engineer or such other individual specified in the Contract Documents as responsible for reviewing such documents.*

***

The person reviewing the Submittal will return them to the Contractor marked to indicate whether the Contractor may proceed with the Work based on the Submittal as is or with specified changes, whether the Contractor must make changes to the Submittal and resubmit it, or whether the Submittal is rejected and the Contractor must submit another Submittal. The review and/or acceptance of any Submittals shall not relieve the Contractor of its full responsibility for proper functioning, fit and conformity with the Contract Documents.

***

*Submittals are not and, notwithstanding any review and acceptance thereof by the Port or any Design Consultant, shall not be construed to be Contract Documents.*

The purpose of review and acceptance of Submittals by the Port Authority or Design Consultant is merely an effort on the part of the Port to determine whether the Contractor is complying with the requirements of the Contract Documents and shall in no way operate as a waiver of any right of the Port or any obligation of Contractor hereunder, nor in any way relieve Contractor of any of its obligations hereunder. Review and acceptance of Submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. *The Port Authority's and/or Design Consultant's review and acceptance of the Contractor's Submittals shall not constitute approval of safety precautions or of any construction means, methods, techniques, sequences or procedures.* The Port Authority's and/or Design Consultant's review and acceptance of a specific item shall not indicate review and approval of an assembly of which the item is component.

(emphasis added).

As discussed next, we reject the Port's contention that it was entitled to order Zachry to revise and resubmit the use of the frozen cutoff wall to complete the expanded wharf as contemplated by Change Order 4. Instead, we conclude that legally sufficient evidence supports the jury's contract interpretation—i.e., that the frozen cutoff wall was included in Zachry's chosen means and methods of performing the work.

The parties agree that Zachry's original freeze-wall design was part of its excavation and shoring safety plan, which is covered by section 4.07 of the Contract. This section, entitled "Health and Safety," provides:

The Contractor shall submit five (5) copies of a health and safety plan for the Work to the Chief Engineer for review at least

13

forty-eight (48) hours prior to commencing performance of any Work at the site. Prior to beginning any field work at the site, such plan shall be certified, by signature of the SHSC [Contractor-designated Site Health and Safety Coordinator], that it complies with applicable portions of OSHA standards 29 CFR 1910 and 29 CFR 1925. Such plan shall provide, at a minimum, for safe working practices, medical surveillance, engineering safeguards, personnel protective equipment, training, safe operating procedures, emergency planning, reporting and sanitation. *Notwithstanding the Chief Engineer's review of the health and safety plan, the Contractor, and not the Port Authority, shall be responsible for and have control over ensuring the safety of its personnel and its Subcontractors, agents, representatives and any other person who visits the site in connection with the Work.*

(emphasis added). Thus, the Port was authorized to "review" the plan, but this section re-emphasizes that it was Zachry, not the Port, that was responsible for—and had control over—ensuring on-site safety. And in fact, the Port did not approve or reject the initial freeze-wall plan, which Zachry submitted to the Port as Zachry's shoring-safety-plan addendum to its previously filed health and safety plan under Technical Specification 02161 (T.S. 02161).[5]

Specifically, T.S. 02161 required Zachry to (1) submit its Proposed Trench Excavation and Shoring Safety Plan and (2) submit all modifications of the plan to the Port's Chief Engineer, accompanied by the signed statement of a Registered Professional Engineer that the modification is "designed in compliance with the Contractor's Standard of Care" and is in conformance with OSHA. The Port counters that because T.S. 02161 requires "submission" of modifications to the safety and shoring plan, these "submissions" were subject to the "submittal" process provided in section 5.22. Thus, the Port urges that it was authorized to order Zachry to revise and resubmit its frozen cutoff wall plan, which is exactly

---

[5] Instead, the record reflects that the plan, which had been approved by a Texas Professional Engineer as required by T.S. 02161, was provided to the Port and marked "Accepted for Records."

14

what it did when it returned Zachry's plan with the R&R response. We disagree with the Port's proposition, as we explain next.

T.S. 02161, entitled "Trench Excavation and Shoring Safety Plan," provides in pertinent part as follows:

C.    Modifications

All modifications to the CONTRACTOR'S Trench Excavation and Shoring Safety Plan or the detailed plans and specifications necessitated by the site conditions, CONTRACTOR'S trench construction means, methods, techniques or procedures and CONTRACTOR'S equipment to be used in construction of project facilities to be submitted to the Chief Engineer. All such modifications to be signed and sealed by a Registered Professional Engineer licensed in the State of Texas and a statement provided stating that the modified plan and/or the modified detailed plans and specifications for the trench safety system are designed in compliance with the Contractor's Standard of Care and is in conformance with appropriate OSHA standards. Such modifications to CONTRACTOR'S plan and/or the CONTRACTOR'S detailed plans and specifications for the trench safety system to thereafter be incorporated into the Construction Contract.

***

1.3    SUBMITTALS

The successful Contractor to submit its proposed Trench Excavation and Shoring Safety Plan after the Award of the Contract. The plan to incorporate detailed PLANS and Specifications for a trench safety system conforming to OSHA standards that accounts for project site conditions, CONTRACTOR'S trench construction means, methods, techniques or procedures, the relationship of spoil to edge of trench, and  CONTRACTOR'S equipment to be used in construction of project facilities requiring trench system(s). CONTRACTOR to provide a statement signed and sealed by a Registered Professional Engineer licensed in the State of Texas stating that the Trench Excavation and Shoring Safety Plan and the detailed plans and specifications for the trench safety system are designed in compliance with the Contractor's Standard of Care and in conformance with

15

appropriate OSHA standards. CONTRACTOR'S plan and the detailed PLANS and SPECIFCATIONS for the trench safety system to be incorporated into the bid documents and the Construction Contract.

Thus, nothing in the plain language of T.S. 01261 references section 5.22 or suggests that the Port could control Zachry's manner and methods of ensuring the safety of the construction site.

However, the Port asserts that section 1.1(A) of T.S. 01261, which provides that it is "subject to" the general and special conditions of the contract, permitted it to order Zachry to revise and resubmit the frozen cutoff wall plan under the procedures provided in section 5.22 of the Contract. But just as this provision is "subject to" section 5.22, it is likewise "subject to" section 5.10, which prohibited the Port from exercising control over Zachry's "manner and methods" of performing the work. And the fact that some provisions of the Contract allowed the Port to *receive* means-and-methods-related submittals does not mean that the Port was authorized to *exercise control* over Zachry's manner and methods. Instead, as the Port's Chief Engineer Steve DeWolf explained, there were "activities and other things that [Zachry] would not be required to submit" under the revise-and-resubmit portion of section 5.22. Thus, according to DeWolf, Zachry "would not necessarily have to submit [its] means and methods as a capital S Submittal." DeWolf testified that the Port "would not want to be held responsible for some issue that might develop from [Zachry's] means and methods." DeWolf distinguished between "capital S" submittals subject to the revise and resubmit option under section 5.22 and other, non-technical submittals that were not subject to that option.

Indeed, DeWolf's explanation of the difference between "capital S Submittals" and other, non-technical submittals harmonizes sections 5.10 and 5.22

16

so that neither is rendered meaningless. *See, e.g.*, *J.M. Davidson*, 128 S.W.3d at 229 (a contract should be considered in its entirety, with provisions harmonized so that none of them are rendered meaningless). Thus, section 5.22 can be read as providing for two types of submittals: (1) technical, "Work"-related submittals (or, as DeWolf characterized them, "capital S Submittals") and (2) other, non-technical submittals. Under this reading of section 5.22, only technical, work-related "capital S" submittals would be subject to the revise and re-submit option contained therein. Those submittals that related to Zachry's means and methods of completing the work—including the use of the freeze-wall technology—would be provided to the Port for its review. In contrast, reading section 5.22 to permit the Port to exercise control over Zachry's means and methods of performing the work would vitiate section 5.10.

And if the Port exercised control over Zachry's health and safety plan, it risked losing the insulation from liability that section 5.10 of the Contract was explicitly designed to provide. *See Zachry Constr. Corp.*, 449 S.W.3d at 102 & n.4. The Port's witnesses testified that the Port did not approve or reject the original freeze wall to avoid claims it controlled Zachry's methods and any attendant liability. The record supports an inference that neither party contemplated that the Port could approve or order Zachry to revise its main freeze-wall plan because Zachry built it and began installing freeze-pipes before providing the Port the design. Further, DeWolf agreed that the freeze wall *and* the frozen cutoff wall "would not have been part of the permanent work, so it would not be a capital S Submittal" subject to the revise and resubmit process contained in section 5.22. De Wolf stated that Port "would not have wanted to be in a position of having approved means and methods." And he acknowledged that

17

using the freeze-wall technology "was Zachry's selected *method* of performing the construction." (emphasis added).[6]

All of this evidence supports the jury's determination that, despite section 5.22, many parts of Zachry's performance under the Contract—including Zachry's submission of its frozen cutoff wall plan under T.S. 01261—were not subject to the "revise and resubmit" option therein   Indeed, Zachry bid the entire project, including Change Order 4, with the expectation that it would use the freeze-wall methodology; the Port selected Zachry for this job based on this innovative and environmentally friendly technique.  As the Texas Supreme Court explained,

> Zachry's plan was innovative.  It would use soil dredged from the channel to construct an 8–foot–wide earthen berm starting from the shore at either end of the worksite, extending out toward the center of the channel, then running parallel to the shore, forming a long, flat U-shaped wall in the channel around the construction area.  Zachry would install a refrigerated pipe system in the wall and down into the channel floor that would carry supercooled brine, freezing the wall to make it impenetrable to the water in the channel.  Zachry would then remove the water from the area between the wall and the shore.  In this way, Zachry could work "in the dry", using bulldozers and other land equipment for the excavation and revetment work.  Another advantage to this freeze-wall approach was that it would lower diesel emissions and require fewer nitrous oxide credits under environmental laws, giving the Port more flexibility in other construction projects.  Zachry believed this approach would make the work less expensive and allow it to be completed more quickly.

---

[6] The Port asserts that Zachry "absurdly argues" that "no R&R response could be based on risk to the Wharf's structural integrity."  But the jury was tasked with interpreting the Contract as a whole, including whether and to what extent Change Order 4 impacted the "Work" under the Contract.  And there was conflicting evidence concerning the impact of Zachry's use of the frozen cutoff wall on the structural integrity of the wharf.  In fact, there was some evidence from which a reasonable juror could determine that the Port manufactured concerns about the frozen cutoff wall's impact on the structural integrity of the wharf.  By its answer to Question 1, the jury determined that the use of the frozen cutoff wall did not amount to "Work" under the Contract.  We will not revisit this issue because it rests on the jury's reasonable credibility determinations. *See City of Keller*, 168 S.W.3d at 816–17, 819–20, 822.

18

*Id.* at 102. Simply put, to permit the Port to later modify Zachry's manner and methods of performance would contravene the clear insulation from liability provided by section 5.10. *See id.*

In sum, the record supports the jury's determination that not all submittals under the Contract were subject to the revise and resubmit process detailed in section 5.22. And there is more than a scintilla of evidence that the frozen cutoff wall was Zachry's chosen method of completing the project (as expanded by Change Order 4). Viewing the evidence in the light most favorable to the jury's finding that the Port failed to comply with section 5.10, we conclude that reasonable and fair-minded people could find that the Port's R&R order in response to Zachry's submission of the frozen cutoff wall design violated section 5.10 of the Contract. Thus the evidence is legally sufficient to support this finding. *See City of Keller*, 168 S.W.3d at 822.

Because we determine that the evidence is legally sufficient to support the jury's finding that the Port failed to comply with section 5.10, we overrule the Port's first issue.

### III. Damages and Causation

In the Port's second and third issues, the Port challenges the damages finding. The same standard of review laid out above for legal sufficiency of the evidence applies to this issue.

### A. Damages

The Port urges in issue two that the jury's damages findings fail as a matter of law.[7] These challenges are all based on the Port's allegation that the testimony

---

[7] The pertinent jury question and instructions is as follows:

19

and methodology of Zachry's damages expert, Gary Draper, was unreliable and thus no evidence because it was based on assumed facts that were contrary to the undisputed facts. *See Burroughs Wellcome Co. v. Cyre*, 907 S.W.2d 497, 499–500 (Tex. 1995) ("When an expert's opinion is based on assumed facts that vary

---

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Zachry for its damages, if any, that resulted from the Port's failure to comply?
>
> Consider the following elements of damages, if any, and none other.
>
> A. The balance due and owed by the Port, if any, under the Contract, including any amount owed as compensation for any increased cost to perform the work as a direct result of Port-caused delays, and
>
> B. The amount owed, if any, for additional work that Zachry was directed to perform by the Port in connection with the Contract.
>
> You may consider amounts, if any, owed as compensation for increased cost to perform the work as a direct result of Port-caused delays, if any, only if you find that such increased costs were a natural, probable, and foreseeable consequence of the Port's failure to comply.
>
> In determining the balance due and owed for the increased cost to perform the work under A (above), if any, and the amount owed for additional work under B (above), if any, you should include Reimbursable Costs as defined in section 1.1 of the Management Services Agreement (PX 643), incurred by New Zachry to perform Zachry's obligations under the Contract.
>
> You are instructed that Zachry was not required to take any of the following actions to be able to recover damages for the Port's failure to comply: (1) obtain a written Construction Change Directive or a fully executed Change Order from the Chief Engineer under § 5.41 or under § 5.52 to the extent it imposes requirements consistent with §5.41; or (2) provide notice that a Contract interpretation by the Port constituted a change to the Contract under § 5.42 and that Zachry was entitled to an adjustment in the Contract Time and Price. You are instructed that you may consider §§ 5.41, 5.42, and 5.52 to the extent it imposes requirements consistent with §5.41, only in assessing a party's state of mind.
>
> ***
>
> Do not include in your answer any amount that you find that the Port proved, by a preponderance of the evidence, that Zachry could have avoided by the exercise of reasonable care.

The jury answered this question, "$18,602,697."

20

materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.").

Draper provided a damages model to the jury that compared Zachry's actual costs to complete the work "in the wet" with a hypothetical model of Zachry's costs had it been able to complete the work "in the dry" as Zachry had planned and bid the project. More specifically, Draper (a) identified the construction activities the switch impacted; (b) as to each impacted activity, calculated the cost Zachry would have incurred working in the dry as long as possible; (c) compared those costs to the costs Zachry reasonably incurred as a result of switching to the wet earlier than it would have absent the Port's breach; and (d) excluded all other costs. Using this methodology, Draper calculated the costs of the switch to be approximately $27 million. After hearing the evidence, the jury awarded Zachry $18,602,697, roughly two-thirds of the damages supported by Draper's model.

We begin by noting that the Port ignores the evidence supporting Draper's model and instead asserts Draper's dry schedule "varies drastically" from "dozens of schedules" Zachry prepared around the time of the Port's rejection of the frozen cutoff wall method. The record reflects that Draper's model was based on the use of a frozen cutoff wall methodology; in contrast, the schedules the Port relies on were not based on a frozen cutoff wall, as they were created after the Port's rejection of this process. Accordingly, these schedules did not project what Draper projected—a completion schedule using a frozen cutoff wall. But despite this defect in the Port's general argument, we consider each of the Port's asserted "contrary facts" on which Draper relied in turn.

### 1. Removal of Freeze Pipes from Berm

The Port claims that "Draper erroneously assumed it would take Zachry no time (and cost Zachry no money) to remove a thousand freeze pipes from the

21

thawed earthen wall (berm)." This faulty assumption, according to the Port, means that Draper's testimony and evidence was unreliable and no evidence of Zachry's damages. But the Port ignores the evidence supporting Draper's methodology.

First, Draper's "in the dry" model—consistent with the evidence—provided for freeze-pipe removal to occur concurrently with berm removal. The record reflects that Zachry's dry approach was to remove the berm and freeze-pipes simultaneously and using the same equipment. And the Port's own freeze-wall expert at trial, Mageau, concluded at the time of the R&R order that Zachry could remove the freeze-pipes and perform the remainder of the work by mid-February to mid-March 2006 so the crane-ship could timely dock, even though he was aware of issues with the freeze-pipes and other challenges Zachry faced. In fact, Draper's schedule was consistent with the contemporaneous frozen cutoff wall project schedule created by Zachry shortly before the Port rejected that method.

Second, the Port characterizes Draper's testimony to suggest that Zachry could remove all the freeze pipes in one day. Draper did not testify that all the freeze pipes could be removed in one day; instead, he stated that the float time in his methodology would cover any time necessary to remove these pipes. Finally, the Port cross-examined Draper on this point. The jury did not unquestioningly accept the testimony of Zachry's expert but reduced the amount of damages presumably based on the challenges made by the Port to Draper's model. *Cf. Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) (upholding damages for lost profits in breach of contract case despite varying assumptions in the parties' competing damages models).

For the foregoing reasons, we conclude that Draper's damages model was not unreliable based on the Port's freeze-pipe removal assertion; conflicting

evidence was presented on this issue and the jury resolved the conflicts in favor of Zachry, although it reduced the damages amount established by Draper's model. *Cf. id.*

### 2. Work on Sheet Pile for Frozen cutoff wall

The Port urges that, because Draper's damages model showed Zachry working on installing sheet pile[8] for the frozen cutoff wall forty days before it actually began doing so, Draper's methodology is unreliable and no evidence of damages. In making this argument, the Port relies on Anderson's testimony referencing a November 15 list of remaining tasks. Neither that list nor Anderson's testimony references sheet-pile-installation timing for the frozen cutoff wall; the Port had rejected the frozen cutoff wall a month earlier. Yet in its briefing, the Port inserts "frozen" into Anderson's testimony "that there was work to be done before we were ready for the [frozen] cutoff wall." Anderson was discussing the status as of November 15—when Zachry was considering the *alternate cutoff wall's* viability. The Port's argument assumes that, after the Port's October 11 rejection of the frozen cutoff wall, Zachry nonetheless proceeded as if Zachry would still be using the frozen cutoff wall.

Further, even if Anderson were testifying that work remained as of October 11, he also testified it would take "a couple of days at best." And although Draper's schedules showed sheet-pile installation starting October 7, it was an "early start," meaning it could start later with no impact on his analysis. Indeed, the float allotted for in Draper's schedule allowed the sheet-pile installation to be delayed until November 15 or later.

---

[8] "Sheet pile"—steel sheets—would have lined the frozen cutoff wall berm and also would have composed Mageau's alternate cutoff wall.

Finally, as with the freeze-pipe removal issue, the Port raised this issue during cross-examination, and the jury's damages award—significantly less than Draper's model supported—accounted for any weight the jury gave it. *Cf. id.* In short, the Port's assertion regarding the sheet piles does not render Draper's testimony unreliable and no evidence.

For the foregoing reasons, we overrule the Port's second issue in its entirety.

## B.    Causation

Next, in its third issue, the Port contends that expert testimony was necessary to prove that the Port's breach ***caused*** Zachry to abandon Zachry's "in the dry" construction methods. In support of this proposition, the Port cites *Mack Trucks v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). But *Mack Trucks* is not a breach of contract case; instead, it is a products liability case in which the plaintiff failed to present expert testimony regarding the cause of a fuel leak in a tractor's fuel system. *See id.* at 582–83.

Our research has not revealed a breach of contract case requiring expert testimony to establish a causal link between the breach that occurred and the resulting damages.[9] Because the Port has not cited, nor have we found, any cases requiring expert testimony to establish that a party's breach of contract caused the damages awarded by the jury, we decline to impose such a requirement in this case. *Cf. Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (concluding that, in a DTPA case, non-expert testimony may provide legally sufficient evidence to establish causation and exclude alternative causes).

---

[9] Although numerous cases discuss the necessity of expert testimony to prove damages in contract cases, these cases concern the *quantification* of the damages, rather than the *cause* of damages. *See, e.g.*, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 345 (Tex. 2011); *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 842–43 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

24

Instead, the evidence must show that the damages are the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). Moreover, this court has recognized that a contractor is entitled to recover damages from an owner for losses due to delay and hindrance of its work if it proves: (1) that its work was delayed or hindered, (2) that it suffered damages because of the delay or hindrance, and (3) that the owner was responsible for the act or omission that caused the delay or hindrance. *Shintech Inc. v. Grp. Constructors, Inc.*, 688 S.W.2d 144, 148 (Tex. App.— Houston [14th Dist.] 1985, no writ) (citing *City of Houston v. R.F. Ball Constr. Co.,* 570 S.W.2d 75, 77 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.)). Here, there is more than a scintilla of evidence to support the finding that the Port was responsible for the act that caused the delay to Zachry's work. Anderson and geotechnical expert Hugh Lacy testified that, once the Port rejected the frozen cutoff wall, Zachry had no viable alternative method to bifurcate the project and complete the wharf in the dry in time for the crane ship to dock. Both agreed that Zachry had to switch to working in the wet far earlier than it otherwise would have. In fact, the Texas Supreme Court summarized the evidence regarding the Port's breach and the resulting delay damages to Zachry as follows:[10]

---

[10] Although the sufficiency of the evidence was not before the Supreme Court on this particular issue, we note that the Court stated its background facts under a legal sufficiency standard:

> The evidence in this case was hotly disputed at almost every turn. We do not pause in this rehearsal of the proceedings to note each disagreement. In reviewing any case tried to a jury, we must view the evidence "in the light most favorable to the verdict"—in this case a verdict for the petitioner—"crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not" and so summarize the evidence in that light. *Cruz v. Andrews Restoration, Inc.,* 364 S.W.3d 817, 819 (Tex. 2012) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex. 2005)).

*Zachry Constr. Corp.*, 449 S.W.3d at 101 n.3.

Nine months into the project, the Port realized that it would need two 1,000–foot berths to accommodate the ships it ultimately expected to service. A sixth 332–foot section would have to be added to the wharf. As a practical matter, only Zachry could perform the additional work, and Zachry and the Port began discussions on a change order. To complete the two sections of the wharf needed by February 2006, and to continue to work "in the dry", Zachry proposed to build another freeze-wall—a cutoff wall—though the middle of the project, perpendicular to the shoreline out to the existing wall, splitting the project into two parts. Zachry would finish the west end where the ship from China would dock, remove the wall barricading water from that area, then continue working on the east end "in the dry".

The Port had reservations about this plan. Near the shore, the cutoff wall would have to be built through the area where piers had already been driven into the channel floor. The Port's engineers were concerned that freezing the ground near the piers might destabilize them, weakening the wharf and making it unsafe. But the Port was also concerned that if it rejected Zachry's plan, Zachry might simply refuse to undertake the addition of a sixth section. So the Port did not raise its concerns with Zachry. Zachry, for its part, had already identified the issue, but its own engineers had concluded that any piers that might be affected could be insulated from the frozen ground. Change Order 4, using Zachry's approach to add a sixth section of the wharf at a cost of $12,962,800, was finalized September 27, 2005.

Two weeks later, the Port ordered Zachry to revise and resubmit its plans without the cutoff wall. *The practical effect of the Port's order was to refuse to allow construction of the cutoff wall. Zachry protested that, under Section 5.10 of the contract, the Port had no right to determine the method and manner of the work, but the Port would not budge. Zachry's only option was to finish the westmost sections in time for the ship from China to dock, then remove the wall altogether and continue to work "in the wet", which would delay completion of the project and increase its cost.*

*Zachry Constr. Corp.*, 449 S.W.3d at 102–03 (emphasis added).

Viewing the evidence in the light most favorable to the verdict, we conclude that that the evidence was legally sufficient to support the jury's verdict. Although

26

the Port submitted evidence that tended to contradict Zachry's evidence, there was "more than a mere scintilla" of evidence on which a reasonable jury could find that the Port's failure to comply with the Contract resulted in damages to Zachry. We thus overrule Zachry's third issue.[11]

## IV. Alleged Conditions Precedent

In its fourth issues, the Port contends that Zachry failed to comply with two provisions of the Contract that the Port urges were conditions precedent—sections 5.41 and 5.42. As such, according to the Port, judgment in the Port's favor on Zachry's R&R claim must be rendered. The trial court instructed the jury that Zachry did not have to comply with these sections to recover damages; instead, the jury was to consider sections 5.41 and 5.42 "only in assessing a party's state of mind."

Sections 5.41 and 5.42 set forth procedures that allowed the Port to make changes within the scope of the contract work during performance of the Contract. Section 5.41 relates to "Changes or Modifications" through change orders, and

---

[11] The Port further argues in this issue that CH2M Hill's Andy Thiess "issued" the R&R response, which he lacked authority to do. The Port cites special condition 12(d) of the Contract, which provided that CH2M Hill, as the Construction Manager of the project, did not have the authority of the Port's Chief Engineer and had "no authority to . . . change any of the terms and conditions of the Contract, including without limitation, issuing Modifications . . . or Change Orders." But the R&R response is not a modification or change order, and nothing on the face of the R&R order indicates it was issued by Thiess. Instead, it bears the seal of the Port of Houston. And under special condition 12(d), CH2M Hill was tasked with coordinating the paper flow for the Project, including Submittals and Change Orders. Zachry was required to submit paperwork to CH2M Hill, and CH2M Hill was charged with managing the flow of the paperwork to and from the appropriate Port personnel, including the Chief Engineer. CH2M Hill additionally was charged with conducting all pre-construction and progress meetings, and it was during these progress meetings that CH2M Hill and Zachry personnel discussed the Port's R&R response to Change Order 4. Further, we resolve the Port's complaint regarding the "apparent authority" instruction in the jury charge against the Port *infra* in section VII of this opinion. Thus, the jury properly considered whether CH2M Hill had authority to act on behalf of the Port as regards to the R&R response.

section 5.42 concerns "Changed Conditions or Contract Interpretations." More specifically, section 5.41 applies to "changes and modifications to the Contract Documents within the general scope of the Work," and requires a change order to "stipulate the Work to be performed" and "any difference in the Contract Price." Section 5.42,[12] on the other hand, required five days' written notice of any "interpretation of the Contract" by the Port that Zachry "believes . . . constitutes a change to the Contract," if Zachry believed it was entitled to an adjustment in the Contract time or price. Under section 5.42, the Chief Engineer's determination of whether there should be a "modification" or "equitable adjustment" was "final and conclusive," and Zachry was forbidden from "begin[ning] performing that portion of the Work affected by such interpretation" before giving notice.

Zachry has never asserted that the Port, by denying Zachry the use of the frozen cutoff wall as its means and methods of performing Change Order 4, effected "changes or modifications" to the Contract or "interpreted" the Contract in a manner that constituted a "change" to the Contract as is provided for in these sections. Rather, Zachry's case hinges on the proposition that the Port *breached* the Contract by rejecting the frozen cutoff wall. Zachry did not seek the "difference in the Contract Price" under section 5.41 or "an adjustment in the . . . Contract Price" under section 5.42. Instead, Zachry sought, and the jury awarded, damages for the Port's breach of the Contract. We thus interpret these provisions as applying only to changes relating to the "Work" under the Contract, not to

---

[12] Pre-trial, the Port unsuccessfully moved for summary judgment on the ground that Zachry's claim for R&R damages was barred by this provision. Zachry, also pre-trial, sought to invalidate section 5.42's notice requirements on the grounds that this section did not apply to Zachry's breach-of-contract claim and, even if it did, it was invalid under Texas Civil Practice & Remedies Code section 16.071. The trial court agreed with Zachry and determined that section 5.42 was "inapplicable" to the facts of this case and "void" under section 16.071 of the Civil Practice & Remedies Code.

28

Zachry's methods and means, over which Zachry was explicitly in control under section 5.10, as discussed *supra*.

Further, the Port's interpretation of section 5.42 of the Contract would require us to read this section as follows: "If the Contractor believes that any interpretation of the Contract Documents by [the Port and its agents] constitutes a ***breach of*** the Contract, the Contractor shall immediately notify the Chief Engineer" in writing within five calendar days after the interpretation constituting the breach. Such a reading of this provision would run afoul of Texas Civil Practice & Remedies Code section 16.071, which provides:

> A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void.

Tex. Civ. Prac. & Rem. Code § 16.071(a).

The Port asserts that section 16.071 of the Civil Practice & Remedies Code does not apply to section 5.42 because it only "voids contract provisions that require, as a condition precedent to suit, less than 90 days' notice *of a claim for damages*." The Port urges that, under *American Airlines Employees Federal Credit Union v. Martin*,[13] section 16.071 does not apply where the notice has some "*other* purpose, *i.e.*, a purpose other than giving notice of a claim for damages." But *American Airlines* does not stand for a proposition so broad; rather the Supreme Court of Texas simply explained in *American Airlines* that "section 16.071 by its terms does not apply *here*, when the notice to be given is not notice of a claim for damages, but rather notice of unauthorized transactions. The

---

[13] 29 S.W.3d 86, 97–98 (Tex. 2000).

purpose of this notice requirement, as we have discussed, is to prevent further unauthorized transactions." 29 S.W.3d 86, 97 (Tex. 2000) (emphasis added).

Moreover, our interpretation of section 5.42 does not render the provision meaningless or invalid, as the Port argues, because not every interpretation of the Contract documents by the Port would constitute a breach of the contract. For example, if the Port specified the type of a particular material to be used in building the Wharf, such as a certain type of concrete, and Zachry believed that this interpretation of the Contract entitled it to a change in the Contract time or price, then this provision would have provided a valid means of quickly resolving the issue.[14] Thus, in many circumstances, this provision would not violate section 16.071 of the Civil Practice & Remedies Code. Conversely, here, Zachry has never claimed that the Port interpreted the Contract in such a manner that Zachry was entitled to an adjustment in the Contract time or price. Instead, Zachry has urged that the Port *breached* the Contract by controlling Zachry's methods and means—i.e., by rejecting Zachry's use of the frozen cutoff wall. If section 5.42 operated, as the Port urges, to require Zachry to provide five days' written notice of this claim for breach and damages, it would be void under section 16.071 of the Civil Practice & Remedies Code. Indeed, interpreting section 5.42 as the Port suggests would convert nearly any **breach** of the Contract by the Port into a "change" subject to the Chief Engineer's "final and conclusive" determination as

---

[14] As another example, Zachry suggests in its briefing that section "5.42 would apply if the specifications required 'steel,' and [the Port] interpreted that to mean **galvanized** steel, but Zachry believed **black steel** complied." Because section 5.42 could have operated validly in some situations, the "circular reasoning" problem identified in *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *23 n.11 (Tex. App.—Houston [1st Dist.] 208, pet. denied) (mem. op. on reh'g), does not arise in this case. In other words, section 5.42 is not rendered meaningless under our interpretation. *See id.* ("We will not construe a contract in a way that renders a provision meaningless.").

to whether the Port had properly interpreted the Contract and whether Zachry was entitled to a change in the Contract time or price.[15]

We conclude that section 5.42's notice provision is inapplicable under the circumstances of this case as it applies only to "changes" in the Contract, not to "breaches" of the contract. *See Criswell v. European Crossroads Shopping Ctr.*, 792 S.W.2d 945, 948 (Tex. 1990) ("In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible."). Further, interpreting this provision under the facts of this case as the Port suggests would result in the provision being void under the Civil Practice & Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 16.071(a); *cf. Frost Nat'l. Bank v. L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W. 2d 527, 530 (Tex. 1987), and explaining we avoid when possible a contract construction that is "unreasonable, inequitable, and oppressive").

Finally, even if these sections applied to a breach-of-contract claim, "[w]hen an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning change orders and claims for additional costs." *Shintech*, 688 S.W.2d at 151. In other words, breaching owners like the Port are precluded from invoking procedural clauses to bar contractors' claims for damages. *See, e.g.*, *West v. Triple B. Servs., LLP*, 264 S.W.3d 440, 446–50 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (30-day notice requirement); *Shintech*, 688 S.W.2d at 151 (written-notice requirement); *N. Harris Cty. Jr. Coll. Dist. v. Fleetwood Constr.*

---

[15] And the Port knew how to draft a provision detailing conditions precedent to suit. In section 5.55 of the Contract, the Port detailed the process of dispute resolution, explicitly stating, "Participation in non-binding mediation in accordance with this paragraph *shall be a condition precedent* to Contractor having the right to file any legal or equitable action against the Port Authority or any of its commissioners, officers, directors, employees or agents." (emphasis added).

*Co.*, 604 S.W.2d 247, 254 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (change-order requirement); *Bd. of Regents of Univ. of Tex. v. S & G Constr. Co.*, 529 S.W.2d 90, 96 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.) (change-order requirement), *overruled on other grounds by Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401 (Tex. 1997).[16]   Thus, because the Port materially breached the Contract, it is barred from invoking sections 5.41 and 5.42 to bar Zachry's claims for damages.[17]

Under these circumstances, we overrule the Port's fourth issue.

## V. Exclusion of Port's Evidence of Harms/Losses

The Port asserts in its fifth issue that the trial court abused its discretion by excluding evidence of its harm and losses due to Zachry's failure to perform in accordance with the Contract.  In its related sixth issue, the Port contends that the trial court erred or abused its discretion by continuing to exclude (as a discovery sanction) a "subset of evidence" of its harms and losses even after the court held

---

[16] The Port argues that this line of cases does not apply if the contractor continued to perform after the breach.  The Port is simply wrong; in all these cases, the contractors continued to perform after the defendants breached.  *See, e.g.*, *N. Harris Cty. Jr. Coll. Dist.*, 604 S.W.2d at 254 ("At the point of the breach, when the College failed to change its specifications to conform to the actual soil condition, Fleetwood was given the choice of stopping work and recovering under the contract or continuing to work and claiming damages caused by the breach.  Fleetwood chose to continue and sue for damages, and the College cannot now insist on enforcement of the claims provision.").  None of the cases have been overruled on this basis.

[17] The Port also includes a small subsection in this portion of its argument relating to section 5.08 of the Contract, which permitted Zachry to request additional time in certain circumstances.  This section of the Port's argument provides *in toto* as follows:

> The court erred/abused its discretion by excluding evidence that, despite the R&R response, Zachry never exercised its §5.08 right to seek more time to perform.  This evidence went to causation; had Zachry viewed the R&R response as a breach causing the switch to "in the wet," Zachry would have invoked §5.08 and sought more time.

(record citations omitted).  The Port has failed to "make a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."  Tex. R. App. P. 38.1(i).  Thus, it has waived this sub-issue by inadequate briefing.

that Zachry had "opened the door" to evidence of these harms and losses. We begin with a brief overview of the pertinent facts.

## A.    Facts Pertinent to Exclusion of Port's Harms/Losses

Zachry filed suit against the Port in 2006, seeking, among other things, the liquidated damages the Port had withheld from Zachry. On June 3, 2009, the Port filed its third amended original answer and counterclaim. At that time, the discovery deadline had expired on January 16, the pleading deadline had expired on January 23, and trial was set to begin on July 20. In this pleading, the Port, for the first time, alleged, in pertinent part, the following as a defense:

> Zachry agreed to a Milestone A date and the Final Completion date. Zachry agreed to liquidated damages in the event it failed to meet these dates. Zachry failed to meet the Milestone A date and the Final Completion date. In addition, Zachry failed to properly perform Work and the Port Authority had to pay another contractor to correct or mitigate harm caused by Zachry's defective Work. The Port Authority's withholding of monies from payments to Zachry is supported by enforceable provisions of the Contract, including the right to withhold payments (Section 6.05 of the General Conditions), the right of offset (Section 6.17 of the General Conditions),[18] the right to liquidated damages (Section 5.05 of the General Conditions), the right to actual damages in lieu of liquidated damages (Section 5.06 of the General Conditions),[19] and the Specification and Proposal

---

[18] Section 6.17 states:

Offset:

    The Port Authority, without waiver or limitation of any of its other rights or remedies under this Contract and Applicable Law, shall have the right but not the obligation to from time to time deduct from any amounts due or owing by the Port Authority to the Contractor or its surety any and all amounts owed by the Contractor or its surety to the Port Authority.

[19] This section provides that the agreed-to liquidated damages are the minimum amount of damages suffered by the Port: "If the Port Authority suffers damages *in excess of such* minimum amount due to the Contractor's failure to complete within the Contract Time, the Port Authority shall have the right to recover its actual damages." (emphasis added).

(setting forth the concept of reduction of the contract price for late performance). The liquidated damages withheld were a reasonable forecast of just compensation because the Contract provided for liquidated damages in lieu of actual damages and because the Port Authority sustained actual damages in an amount that was not disproportionate to the liquidated damages.[20]

The next day, the Port filed its second amended response to Zachry's request for disclosure, in which it asserted that Zachry was not entitled to recovery against the Port for breach of contract because the Port "acted in accordance with the Contract provisions, including, but not limited to the right to withhold payments (sections 6.05, 6.17, 5.05, and 5.06 of the General Conditions)." The Port further repeated the above allegations from its amended petition.[21]

Zachry responded with an interrogatory on June 11, asking the Port to quantify these harms. The Port responded on July 24—Zachry's interrogatory deadline—by quantifying more than $8 million in alleged harms. Yet the Port did not disclose that it sought to offset these harms against Zachry's damages; instead, this interrogatory response quantified harms in the context of the Port's disclosure

---

[20] In contrast, in its second amended original answer, the Port had alleged more generally as follows:

> Zachry agreed to a Milestone A date and the Final Completion date. Zachry agreed to liquidated damages in the event it failed to meet these dates. Zachry failed to meet the Milestone A date and the Final Completion date. The Port Authority's withholding of monies from payments to Zachry is supported by enforceable provisions of the Contract, including the right to withhold payments (Section 6.05 of the General Conditions), the right of offset (Section 6.17 of the General Conditions), the right to liquidated damages and actual damages in lieu of liquidated damages (Sections 5.05 and 5.06 of the General Conditions), and the Specifications and Proposal (setting forth liquidated damages and the concept of reduction of the Contract price).

[21] Meanwhile, Zachry had attacked the Port's withholding of liquidated damages as an invalid penalty when Zachry filed a motion for partial summary judgment on that basis in December 2008. Although this motion was later denied, the Port was on notice that Zachry would be seeking to invalidate the Port's withholding of liquidated damages nearly eighteen months before the Port set out to quantify its alleged harms/losses.

that it "sustained actual damages in an amount that was not disproportionate to the liquidated damages." Later, in September, the Port increased its claimed harms/losses to around $10.5 million but continued to make this disclosure in the context of proportionality to liquidated damages. The Port did not disclose that it intended to submit these harms/losses to the jury as an offset to reduce Zachry's damages. In fact, the Port's September 17th draft jury charge did not seek any findings as to the Port's actual damages for an offset defense to reduce Zachry's damages award.

On September 29, 2009, the Port revealed that it intended to seek its alleged $10.5 million harms/losses as a defense to reduce any judgment in favor of Zachry.[22] The next day, Zachry moved to strike the Port's defense and exclude any evidence in support of these damages. After a flurry of responses, replies, and hearings, on October 16, the trial court granted in part and denied in part Zachry's motion to strike. In its five-page order, the trial court explained in detail its reasoning:

> [The Port] only listed ANY amounts (other than the $600,000.00 dredging issue) of its actual damages that it proposed to serve as an offset in late July 2009. However, the legal theory under which those quantities were listed was ONLY the proportionality of its liquidated damages offset claim to actual damages. Additionally, [the Port] had timely disclosed $600,000.00 in actual damages much earlier as part of an offset claim pertaining to certain dredging costs.
>
> To this day, [the Port] has not enunciated in any discovery response any *legal theory* that it was seeking to defensively offset or recoup ANY actual damages other than the $600,000.00 amount. Zachry allegedly only learned of [the Port's] apparent attempt to inject first $8 million and then $10.5 million in actual damages (as opposed to liquidated damages) as a defensive claim for offset informally, and not through any supplementation of discovery, such as a supplement

---

[22] At that time, trial was set to begin on October 20.

35

to a request for disclosure under Rule 194.2(c). The Court stated at a hearing that the surprise to Zachry was not that [the Port] was seeking an offset, but that it was seeking to offset a long list of itemized damages as opposed to liquidated damages. It is important to note, again, that in quantifying its "harms" in July 2009, [the Port] was not stating that it would actually be seeking to recover those quantities for those specific harms as an offset.

\*\*\*

[The Port] argues that this Court's March 2009 ruling denying [Zachry's] motion for summary judgment on the enforceability of the liquidated damages clause of the contract excused it from pleading and enunciating in its disclosure responses this alternate theory of actual damages. The Court wants to be fair, as always, but if anything, the suggestion by Zachry by its motion that the liquidated damages clause may not be enforceable should have alerted [the Port] that it needed to plead this theory and enunciate it in terms of the legal theory and amounts in its disclosure responses. Further, Zachry again sought to eliminate the liquidated damages claim by its Rule 166g Motion on or about July 31, 2009, and [the Port] still has not amended its Rule 194.2(c) disclosure response to enunciate an actual damages theory of offset or recoupment, nor sought leave to do so, to the Court's knowledge. [The Port's] inclusion, long ago, of the $600,000.00 actual damages figure as part of its offset claim also highlights that [the Port] should have included all of the other categories and quantities of offsets well before the discovery cutoff.

\*\*\*

The bottom line is that to inject $10.5 million in actual damages or recoupment well after all discovery deadlines have passed would dramatically change the landscape of what promises to be a lengthy and complicated trial. It is not fair to ask either side to engage in what the Court perceives would be extensive discovery (including document production, depositions, and potentially additional expert witnesses) on the evidentiary bases for the amounts sought to be offset by [the Port]. The results of that discovery will not be known until long after voir dire and opening statements, and the trial Court will not allow that much fluidity and uncertainty into this trial.

The trial court permitted the Port to offer the following amounts and categories of damages as potential offsets to any damages awarded to Zachry: (1) $600,000 for dredging; (2) "$1 million or so" for damages to wharf fenders; and (3) "$25,000.00 or so" for "cleaning and grubbing." The trial court excluded the remaining categories and evidence of offset harms/losses the Port sought to introduce.

Later, during trial, testimony concerning an email from Port personnel, which was admitted into evidence, was adduced. For example, Zachry's Anderson testified regarding the email and conversation he had with the Port's personnel. Anderson testified and a Port email to the Port's Chief Engineer DeWolf stated that the Port would not charge Zachry the liquidated damages penalty "if no expense or loss" to the Port occurred. Anderson testified that Project Engineer Jim McQueen told him during a meeting that, although Zachry had sought an extension of time due to a concrete shortage, the Port was denying the time extension, but would not charge Zachry penalties "since the [crane ship from China] ha[d] been delayed in its arrival time" and "there were no damages done."

The Port argued that testimony about this email, as well as the email itself, opened the door to evidence of its harms/losses that had been excluded pre-trial. The trial court agreed that Zachry had opened the door to evidence of harms/losses, later clarifying by a written order that Zachry had opened the door to this evidence "to a degree" and only up to the date that the Port notified Zachry that it would be charging liquidated damages, i.e., May 15, 2006. However, in this same order, the trial court concluded that, under Texas Rule of Evidence 403, "any probative value of injecting all of the evidence of alleged harms into the trial would be substantially outweighed by the danger of (1) unfair prejudice to Zachry, and (2) considerations of undue delay."

The Port complains about both the trial court's pre-trial ruling excluding evidence of its harms/losses and the trial court's Rule 403 ruling during trial. With this factual background in mind, we consider each of these issues in turn, bearing in mind that we apply an abuse of discretion standard to the question of whether a trial court erred in an evidentiary ruling. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) ("Evidentiary rulings are committed to the trial court's sound discretion."). Further, even if the trial court erred in its evidentiary ruling, "reversal is only appropriate if the error was harmful, *i.e.*, it probably resulted in an improper judgment." *Id.*

## B.    Pre-trial Exclusion

The Port challenges the pre-trial exclusion of this evidence in its fifth issue. Our Rules of Civil Procedure provide that a party may request disclosure of "the legal theories and, in general, the factual bases of the responding party's claims or defenses" or "the amount and any method of calculating economic damages." Tex. R. Civ. P. 194.2(c), (d); *see also* Tex. R. Civ. P. 194.6 cmt. 2 (explaining that a defendant in a negligence suit involving a car wreck "would be required to disclose his or her denial of . . . any basis for contesting the [plaintiff's] damage calculation"). Further,

> [a] party who failed to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence that material or information that was not timely disclosed . . . unless the court finds that:
>
> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
>
> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

Tex. R. Civ. P. 193.6(a). The party seeking to introduce the evidence bears the burden of establishing good cause or lack of unfair surprise or unfair prejudice. Tex. R. Civ. P. 193.6(b). Finally, it is within the trial court's discretion to determine whether the party offering the evidence has abided by the appropriate disclosure rule. *Cf. Sharp v. Roadway Nat'l Bank*, 784 S.W.2d 669, 671 (Tex. 1990) (per curiam) ("However, if the trial court finds that the party offering the testimony had good cause for failing to supplement, it may, in its discretion, admit the testimony.")

The Port claims that the trial court "misread" Zachry's interrogatory and the Port's response. The Port urges that its reference to "offset" in its disclosure and later interrogatory response quantifying its harms/losses were sufficiently timely such that the trial court "wrongly" excluded this evidence. Finally, the Port suggests that neither Zachry's interrogatory nor the Port's response mentioned proportionality or limited the relevance of the quantified harms/losses to proportionality of the liquidated damages.

But we do not examine these pleadings in a vacuum. Despite the Port's assertions that neither Zachry's interrogatory nor the Port's response mention liquidated damages, it is clear from the context of the pleadings at issue that the Port was quantifying its alleged damages in an effort to establish proportionality to the liquidated damages it had withheld. Further, as the trial court stated in its order, the Port did not detail the $8.5 million of actual damages it sought as an offset until July 2009, months past the January 2009 discovery deadline. And as the trial court opined, the Port was on notice well before the discovery deadline that Zachry was seeking to have the liquidated damages provision invalidated. We additionally note that the Port admittedly was aware of the amounts and categories of its alleged actual harms/losses before the discovery deadline.

In light of the foregoing, we cannot say the trial court abused its discretion in concluding that the Port did not meet its burden to establish good cause or the lack of unfair surprise or unfair prejudice. *See* Tex. R. Civ. P. 193.6(b); *Perez v. Williams*, 474 S.W.3d 408, 420–21. We overrule the Port's fifth issue.

## C.     Trial Exclusion of Evidence

The Port contends in issue six that the trial court's exclusion of this harms/loss evidence after Zachry "opened the door" to this evidence "skewed the trial on two of four [no damages for delay] 'exceptions'—bad faith and arbitrary/capricious." The Port asserts that a trial court must admit "open the door" evidence without performing a Texas Rule of Evidence 403 balancing test, relying on *Horizons/Healthcare v. Auld*, 34 S.W.3d 887, 905–07 (Tex. 2000). Yet *no* Rule 403 analysis was performed in *Auld*, contrary to the Port's contention. *See id.* Here, the trial court performed a Rule 403 balancing analysis. The trial court articulated a basis for its Rule 403 reasoning, including but not limited to the absence of any basis to relieve the Port of the prior discovery sanction or to compel Zachary to cross examine witnesses on damages for which it had had no discovery opportunity—all with little probative value. The Port has not offered any substantive analysis or cited any appropriate authority concerning the propriety of the trial court's analysis.[23]

In short, the Port has failed to establish that the trial court's exclusion of this evidence, even if erroneous, probably resulted in an improper judgment. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 132; *see also* Tex. R. App. P. 44.1(a). Under these circumstances, the Port's sixth issue is overruled.

---

[23] And the Texas Court of Criminal Appeals has held, in considering the very same rules of evidence, that "even if a party opens the door to rebuttal evidence, the trial judge still has the discretion to exclude the evidence under Rule 403." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009).

## VI. No-Damages-for-Delay Fraud Instruction

The Port urges in its seventh issue[24] that the fraud definition included in the no-damages-for-delay portion of the jury charge was erroneous because it permitted the jury to find fraud based on reckless, rather than intentional, behavior. The Port complains that the type of fraud at issue—a promise of future performance made with no intent to perform—must be intentional, not reckless. Yet the Supreme Court explicitly held, "The charge correctly described the misconduct that cannot be covered by a no-damages-for-delay provision." *Zachry Constr. Corp.*, 449 S.W.3d at 117. The Port's argument ignores the law-of-the-case doctrine. Under this doctrine, a decision rendered in a former appeal of a case is generally binding in a later appeal of the same case. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 182 (Tex. 2012) (citing *Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 716 (Tex. 2003)).

We are bound by the Texas Supreme Court's express holding that the charge "correctly described the misconduct that cannot be covered by a no-damages-for-delay provision." Thus, this issue is without merit, and we overrule it.

## VII. Apparent Authority Instruction

In issue eight, the Port raises various challenges to the trial court's apparent authority instruction to the jury, including that Zachry failed to plead that CH2M Hill acted with the Port's apparent authority.[25] At bottom, if Zachry pleaded apparent authority, then the trial court did not err in instructing the jury on this matter so long as it was raised by the evidence. *See* Tex. R. Civ. P. 278 ("The

---

[24] This issue is not presented in the Port's "issues presented" section of its brief, but is urged in the Port's argument section.

[25] Importantly, as noted above, nothing on the face of the R&R order indicates it was issued by CH2M Hill; instead, it bears the seal of the Port of Houston.

court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). The Port does not assert that this issue was not raised by the evidence. Indeed, the Port's Chief Engineer DeWolf testified that he had designated CH2M Hill to be his "representative" in exchanging information with Zachry. Other evidence established that the Port expected Zachry to rely on CH2M Hill's communications, that CH2M Hill was DeWolf's representative, that CH2M Hill was the Port's primary contact with Zachry, and that the Port's executives treated CH2M Hill like the Port's own staff.

We thus examine Zachry's pleadings to determine whether it sufficiently pleaded apparent authority, bearing in mind that the trial court stated on the record that Zachry pleaded apparent authority. Zachry pleaded that the Port "expressly charged and designated its Construction Manager, CH2M-Hill, to act on its behalf on this critical cutoff-wall issue." Zachry additionally referred to the CH2M Hill as the Port's designated agent. The purpose of pleadings is to give adversaries notice of each party's claims and defenses, as well as notice of the relief sought. *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991). Generally, in the absence of special exceptions, a petition will be construed liberally in favor of the pleader. *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). The Port did not specially except to Zachry's pleadings; thus Zachry's pleadings must be construed liberally.

Although Zachry did not use the term "apparent authority," Zachry's allegation is sufficient to give notice to the Port that it faced a claim that CH2M Hill had apparent authority to act on the Port's behalf. *See* Tex. R. Civ. P. 45; *see also Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 157 (Tex. App.—Amarillo 2000, no pet.). The distinguishing factor between

42

actual and apparent authority is to whom such authority is communicated: "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). If the Port questioned what was being pleaded, it had the option of specially excepting and having the pleading clarified. *See* Tex. R. Civ. P. 91.

In sum, we cannot conclude that the trial court abused its discretion in determining that Zachry adequately pleaded apparent authority, especially in light of the Port's failure to specially except to Zachry's petition. We thus overrule the Port's eighth issue.

## VIII. Attorney's Fees

In its ninth issue, the Port asserts that it is entitled to attorney's fees because Zachry's R&R claim "should be rendered." Because we have determined that Zachry's R&R claim should not be reversed and rendered, there is no basis for the Port's attorney's fee claim. Accordingly, we overrule the Port's ninth issue.

## IX. Zachry's Pass-Through Damages

In January 2008, Zachry reorganized. The work on this Contract going forward was performed by a new Zachry entity, which the parties refer to as the "Sub," a term we will adopt for ease of reference.[26] The jury found, in Question No. 5, that $8,578,712 of the $18,602,697 R&R damages were costs incurred by

---

[26] In 2007, the Sub was formed as ZCC Corporation, Zachry took a new name (Zachry Industrial, Inc.), and the Sub changed its name to Zachry Construction Corporation (Zachry's former name). In April 2009, Zachry entered into the subcontract with the Sub, but the subcontract was effective January 1, 2008—the date the Sub began performing Zachry's obligations under the Contract. It is undisputed that the Port never consented to Zachry assigning the Contract to the Sub. But, the contract between Zachry and the Sub—the Management Services Agreement—provides that the contract was not and had not been assigned to the Sub, and Zachry remained fully liable to the Port under the terms of the Contract.

the Sub. In its tenth issue, the Port contends that Zachry cannot recover this amount because (1) Zachry did not own the claim for these damages; (2) Zachry cannot recover these damages as a purported "pass-through" claim;[27] (3) Zachry failed to establish its liability to the Sub for these damages; and (4) charge error tainted the jury's finding to Question No. 5. We consider those arguments necessary to resolve this issue next.

## A.    Zachry May Recover these Damages as a Pass-Through Claim

The Port contends Zachry cannot assert a pass-through claim because it hired the Sub after PHA's breach, and thus the Port's "breach . . . did not cause Zachry to breach the subcontract." But nothing in the seminal case approving pass-through agreements requires a breach by Zachry:

> We hold that Texas recognizes pass-through claims. Consequently, if the contractor is liable to the subcontractor for damages sustained by the subcontractor, pursuant to a pass-through agreement the contractor can bring an action against the owner for the subcontractor's damages. If the owner contests the contractor's pass-through suit on grounds that the contractor is not liable to the subcontractor for the claimed damages, the owner bears the burden of proof.

*Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 607, 619–20 (Tex. 2004). Thus, the court in *Interstate Contracting* required only that Zachry "remain liable to the subcontractor for damages sustained by the subcontractor." *Id.* at 619. The *Interstate Contracting* court also recognized a general contractor's decision to

---

[27]A pass-through claim is a claim (1) by a party who has suffered damages (in this case, the Sub), (2) against a responsible party with whom it has no contract (here, the Port); and (3) presented through an intervening party (Zachry) who has a contractual relationship with both. *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 610 (Tex. 2004) (citing Carl A. Calvert, *Pass Through Claims and Liquidation Agreements,* Construction Lawyer, Oct. 18, 1998, at 29; 3 Bruner and O'Connor on Construction Law § 8:51 (2003)). "Instead of one lawsuit between a subcontractor and general contractor and another between the general contractor and the owner, pass-through claims permit a contractor to pursue its subcontractor's claims directly against the owner." *Id.* (citing 3 Bruner and O'Connor on Construction Law § 8:51).

44

hire a subcontractor to perform work necessitated by the owner's breach does not preclude the contractor from recovering the cost for the sub. *Id.* at 611. "Otherwise, the owner could receive a windfall because the subcontractor lacked privity with the owner and the contractor lacked standing to sue the owner for damages suffered by the subcontractor." *Id.* at 615–16.

Zachry established its continuing liability to the Sub for the costs the jury assessed. In the Management Services Agreement ("MSA") between Zachry and the Sub, Zachry promised (1) "to pay to [the Sub] the Reimbursable Costs" the Sub incurred while performing services for Zachry, and (2) to pay to the Sub any payments it received from the Port. In the Pass-Through Agreement between the two, Zachry "agree[d] . . . it is liable to [the Sub], to present the [the Sub's] Claims and remit any recovery from the Port of Houston to [the Sub], in accordance with the terms of this Agreement." The burden therefore shifted to the Port to negate this continuing liability: "If the owner disputes that this requirement [of continuing liability] has been met, it bears the burden of proving, as an affirmative defense, that the pass-through arrangement negates the contractor's responsibility for the costs incurred by the subcontractor." *Id.* at 619–20.

Referencing section 3.2 of the MSA, the Port asserts Zachry might not remain liable to the Sub by speculating that owners on other MSA contracts might have paid Zachry more than the Reimbursable Costs on their contracts. This section provides, in pertinent part,

> Zachry shall have no obligation to pay or reimburse [the Sub] for any Reimbursable Costs in excess of the Contract Payments. Therefore, if the Contract Payments received by [the Sub] are less than the Reimbursable Costs, Zachry will have no liability for any such shortfall. If the Contract Payments exceed the Reimbursable Costs, the parties shall confer and agree upon a mutually satisfactory

45

allocation of any such excess amounts between the Parties consistent with the intents and purposes of the Corporate Restructuring.

According to the Port, any excess payments from any other contracts controlled by the MSA would limit Zachry's liability for reimbursable costs for the Port Contract. But the MSA unambiguously states, "Zachry agrees to pay to [the Sub] the Reimbursable Costs." The Port reads section 3.2 of the MSA to limit Zachry's obligation to pay reimbursable costs when contract payments exceed reimbursable costs. But this section does not suggest that allocation of "such excess amounts" limits any reimbursable costs Zachry must pay to the Sub on other contracts. Finally, the Pass-Through Agreement explicitly requires Zachry to "remit any recovery from the Port of Houston" to the Sub. Thus, there is simply nothing in any of the agreements that limits Zachry's liability to the Sub, and the Port has not born its burden of proving, as an affirmative defense, that the Pass-Through Agreement negated Zachry's responsibility for the costs incurred by the Sub. *See id.*

Regarding the Port's assertion that Zachry provided no evidence that it had any liability to the Sub, Zachry's vice president, John Abiassi, confirmed Zachry's continuing liability to the Sub. Abiassi explained that Zachry was liable to the Sub for "any costs incurred . . . after January 1 of 2008." Abiassi further testified that Zachry agreed to reimburse the Sub for any costs the Sub incurred after January 1 and to remit any claims from this lawsuit that are associated with those costs. Thus, there is more than a scintilla of evidence that Zachry had continuing liability to the Sub for the Sub's costs incurred after January 1, 2008. *See City of Keller*, 168 S.W.2d at 810.

46

## B. Governmental Immunity Does Not Bar the Pass-Through Claims

Finally, the Port further asserts, in two sentences (excluding citations), that governmental immunity bars Zachry's pass-through claim: "[The Port] has immunity for breach of a contract to which [the Port] is not a party. Before enactment of Chapter 271, the Court in *Interstate* said immunity may bar a pass-through claim against the government." Yet the Texas Supreme Court, in *Interstate Contracting*, explained why it specifically chose *not* to address the issue of sovereign immunity. *Id.* at 620 ("Although the questions certified do not limit our answers, we decline to extend our answers in this case to the issue of sovereign immunity, which is well beyond the scope of the questions certified. Doing so would require us to venture into the facts of this particular case and analyze the merits of the parties' claims at issue before the Fifth Circuit Court of Appeals, rather than provide answers solely as to the status of the Texas law on the questions asked."). Thus, we disagree with the Port's assertion that the court in *Interstate Contracting* stated that governmental immunity may bar a pass-through claim.

Further, our sister court in San Antonio was squarely presented with the issue of whether governmental immunity bars a pass-through claim in *City of San Antonio v. Valemas, Inc.*, No. 04-11-00768-CV, 2012 WL 2126932 at *1–7 (Tex. App.—San Antonio June 13, 2012, no pet.) (mem. op.). The San Antonio court, after a thorough analysis, determined that governmental immunity did not bar the pass-through claim of the subcontractor. *See id.* at *7. In determining this issue, the San Antonio court examined the language of section 271.152 of the Local Government Code, as well as several other relevant provisions of Chapter 271. *See id.* at *5–6. After examining the language of the statutory provisions, the San Antonio court stated, "We find nothing in any of these sections to show the

47

Legislature intended to exclude pass through claims from the waiver provision in section 271.152." *Id.* at *6. The court of appeals then went on to consider the legislative history and bill analysis of section 271.152. *See id.* at *6. The court noted that the legislative history "strongly suggests" the Legislature intended to enact a "broad waive for local governmental entities in the contractual setting." *Id.* And the bill analysis suggested that "enactment of section 271.152 was based on the Legislature's recognition of the inherent unfairness in allowing governmental entities to enter into contracts, but then avoid [their] obligations under such contracts by claiming immunity." *Id.*

Ultimately, the San Antonio court explained:

It is common knowledge that when a local governmental entity enters into a contract for extensive renovations or construction, the general contractor with whom it contracts will subcontract with others. If a local governmental entity is immune from pass through claims, requiring subcontractors to sue the general contractor to recover rather than rely on the general contractor to pursue such claims, smaller subcontractors will be less likely to risk entering such agreements- knowing that in the event the contractor is unable to pay because of non-payment by the governmental entity they will be forced to engage in expensive litigation, the cost of which they may not be able to bear, or simply write the matter off as a loss. This puts subcontractors into the same position as contractors, and as recognized by the supporters of the bill that proposed section 271.152 in the context of general contractors, will make many highly qualified subcontractors, especially small businesses, hesitant to enter into such contracts. This will discourage and disadvantage a diverse range of bidding subcontractors and limit the choices of general contractors in direct opposition to what the bill was intended to do.

Accordingly, we hold that just as it is inconsistent with the purpose of section 271.152 to construe it to deny waiver to assignees of those who enter into contracts subject to subchapter I, so is it inconsistent to deny waiver to pass through claims brought by a contractor against a local governmental entity on a subcontractor's behalf. To hold otherwise would subject subcontractors to the same

48

risk of non-redressable breach the statue sought to eliminate, resulting in subcontractors suffering the same problems once suffered by general contractors prior to the enactment of section 271.152.

*Id.* at \*6–7. We agree with the San Antonio court's rationale and likewise hold that governmental immunity does not bar the pass-through claim at issue here. *Cf. Galveston Indep. Sch. Dist. v. Clear Lake Rehab. Hosp., L.L.C.*, 324 S.W.3d 802, 810 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("[W]hen a governmental entity and a contracting party enter into a contract subject to subchapter I and denominate a third-party beneficiary of that contract, the third-party beneficiary's claim for breach of contract falls within the waiver of immunity authorized under section 271.152.").

For the above-described reasons, we overrule the Port's tenth issue in its entirety.[28] *See* Tex. R. App. P. 47.1.

## X. Conclusion

We have addressed and overruled all the issues the Port raised that are necessary to the disposition of this appeal. *See* Tex. R. App. P. 47.1. For the foregoing reasons, we affirm the judgment of the trial court.


/s/    Sharon McCally
       Justice


Panel consists of Justices Christopher, Boyce, and McCally.

---

[28] The remainder of the Port's arguments in this section of its brief are contingent upon our sustaining one of the issues addressed *supra*.

49