**Affirmed and Majority and Concurring Opinions filed December 10, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00052-CV

**SUMMIT GLOBAL CONTRACTORS, INC., Appellant**

**V.**

**ENBRIDGE ENERGY, LIMITED PARTNERSHIP AND ENBRIDGE GATHERING (NORTH TEXAS) L.P., Appellees**

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2013-69313**

## MAJORITY OPINION

This appeal involves two agreements for the fabrication of pipes called "spools" used in the oil and gas industry. Summit Global Contractors, Inc., brought breach of contract and quantum meruit claims against Enbridge Energy, Limited Partnership (Enbridge Energy) and Enbridge Gathering (North Texas) L.P. (Enbridge Gathering). After a bench trial, the trial court found that the Enbridge parties did not breach the contracts and concluded that Summit's quantum meruit

claim was precluded by the express contracts. Summit challenges the sufficiency of the evidence in support of the trial court's findings and challenges the trial court's conclusion regarding the quantum meruit claim. We affirm.

*Background*

The Enbridge parties began construction of a natural gas processing plant in Wheeler, Texas. International Alliance Group (IAG) was hired to solicit bids for the project. IAG in turn placed Summit on its potential vendor list. IAG sent Summit a "Pipe Fabrication Inquiry Requisition" form requesting a bid for "pipe spool fabrication." The scope of work was to include "all labor, material (exclud[ing] items furnished by customer), small tools, consumables, storage, overheads, etc." The requisition form also required the fabricator to "quote Lump Sum."

Summit offered an initial "Lump Sum proposal" including overtime but also specifying that "[a]ny down time will be handled on a Time and Material basis." "Extra Work" was to be billed for materials at cost plus 15% and labor at $85 per hour. Summit's owner, Rich Miller, testified that "lump sum" means a "fixed price" for everything in the scope of the contract, which includes some overtime. "Time and material" pricing, on the other hand, is based on the time expended and the materials used for the job. Miller also specified that payment terms would be "NET 30" from invoice date, meaning payment was due within 30 days of invoicing. The first bid included a price quote from a pipe supplier called Wolseley.

Summit was awarded the job, and a purchase order was issued that incorporated Summit's bid terms and called for a 20% advanced payment. Enbridge Energy was identified as the party to be billed. Enbridge was also

2

required to provide valves for Summit to use in the spool fabrication.[1] The purchase order stated, "PRICE(S) ARE FIRM" and "PRICING AND AVAILABILITY CONFIRMED WITH Rich Miller."

By the time Summit was awarded the job, however, Wolseley's price quote—upon which Summit's bid was based—had expired. Two days after the purchase order was issued, Summit issued a $10,847.54 change order request based on an increase in Wolseley's price. Approximately two weeks later, Summit submitted another change order request for a materials price increase from Wolseley of $87,113.10, which included the amount of the prior request for $10,847.54.

IAG's representative contacted a representative from Wolseley regarding the price increase. The Wolseley representative informed the IAG representative that Wolseley's price quote included in Summit's bid package had been valid for only 15 days and Wolseley received the order past its quote validity date. Following negotiations, Wolseley agreed to decrease its increased price from $87,113.10 to $44,365.53. The purchase order was revised to reflect the $44,365.53 price increase. The record does not reflect which Enbridge entity paid that price increase, but it was paid.

Summit submitted its second "Lump Sum proposal" on June 12, 2012 "to provide labor, material, equipment & delivery necessary to fabricate Pipe Stools." Payment terms, again, were to be "NET 30 from invoice date," and "[a]ny down time [would] be handled on a Time and Material basis." The proposal included overtime. A second purchase order was issued, again with Enbridge Energy identified as the party to be billed. That purchase order incorporated Summit's

---

[1] The purchase order does not specify which Enbridge party was required to provide the valves.

terms and again required a 20% advanced payment. The second purchase order was issued on June 22, 2012. Summit submitted an invoice for the advanced payment on the same day. That invoice was paid on July 13, 2012.

Summit met its first deadline for delivering spools. Summit then fell behind on meeting its remaining delivery deadlines, which were extended. According to Summit, one or both Enbridge parties caused the late deliveries due to delays in making the second advanced payment, negotiating the price decrease with Wolseley, and delivering the valves. Summit contends that it incurred expenses for unexpected overtime and other overhead due to the delays. Summit submitted change order requests after the job was completed totaling $390,088.95 for the purported delays. Representatives from Summit, the Enbridge parties, and IAG met to discuss the change order requests. The Enbridge parties and IAG concluded the requested change orders were not justifiable.

Summit filed an affidavit of lien against Enbridge Energy for $390,088.95 and filed this lawsuit, bringing claims, in relevant part, for breach of contract, quantum meruit, and promissory estoppel. In its petition, Summit alleged that both Enbridge Energy and Enbridge Gathering were parties to the relevant purchase orders. Referring to the Enbridge parties collectively as "Enbridge," Summit alleged that Enbridge breached the contracts. Summit also asserted quantum meruit and other alternative liability claims against both Enbridge parties.

The Enbridge parties answered and filed counterclaims in which they also referred to themselves collectively as "Enbridge." Although both purchase orders identify Enbridge Energy as the party to be billed, the Enbridge parties did not dispute that both defendants were bound by the purchase orders.[2]

---

[2] The purchase orders specified that bills would be sent to Enbridge Energy and identified the "Purchaser" as "the Enbridge entity identified on the face of the Order." The letterhead on

4

After a bench trial, the trial court found that (1) as to the first purchase order, it incorporated Summit's bid terms for a lump sum contract; the payment terms were net 30, and the prices were firm; despite this, the price for materials in Summit's bid had increased; and Summit made its first delivery on time but made subsequent deliveries late; (2) as to the second purchase order, it incorporated Summit's bid terms for a lump sum contract; (3) "Enbridge" paid Summit the entire amount due under both purchase orders plus "over $30,000 that resulted from drawing changes, material price increases, and the like"; and (4) Summit's change order requests totaling $390,088.95 were "untimely and unsupported." The trial court concluded that (1) the purchase orders were valid and enforceable "lump-sum bid contracts"; (2) "Enbridge" did not breach the contracts; (3) Summit is not entitled to recover damages for breach of contract or attorney's fees; and (4) Summit's quasi contract and promissory estoppel claims are precluded by express contract. The trial court referred to both Enbridge parties collectively as "Enbridge" in its findings and conclusions, as did the parties in their proposed findings and conclusions. The court signed a take nothing judgment in favor of the Enbridge parties.

## *Discussion*

In four issues, Summit challenges the legal sufficiency of the evidence in support of the trial court's findings and rulings on Summit's breach of contract and quantum meruit claims. We conclude that Summit has not established as a matter of law that either Enbridge party breached the purchase orders. We further conclude that Summit's quantum meruit claim is precluded by express contract.

the purchase orders identified the entity only as "Enbridge." The purchase orders also state, "Enbridge terms and conditions apply." Enbridge Gathering is not identified on either purchase order as a party.

5

We review a legal sufficiency challenge to court findings using the same standards applied in reviewing the evidence supporting jury findings.[3] *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the evidence in the light most favorable to the challenged findings and indulge every reasonable inference that would support them. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id*. at 827.

We sustain a legal sufficiency or "no evidence" challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 719 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A party attacking the legal sufficiency of an adverse finding on an issue on which it had the burden of proof must show that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

We apply these standards mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 819, 822; *2900 Smith, Ltd. v. Constellation NewEnergy, Inc.*, 301 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 2009, no pet.). When, as here, there is a complete reporter's record of the trial, the trial court's findings of

---

[3] We may review a trial court's findings for both legal and factual sufficiency, *see Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994), but Summit cites the standards of review only for legal sufficiency and analyzes the case under those standards, so we limit our analysis to a legal sufficiency review.

fact will not be disturbed on appeal if there is any evidence of probative force to support them. *See Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

In an appeal from a bench trial, we review a trial court's conclusions of law de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 608 (Tex. App.— Houston [14th Dist.] 2004, no pet.). We review the legal conclusions drawn from the facts to determine their correctness. *BMC Software*, 83 S.W.3d at 794; *Stavinoha*, 126 S.W.3d at 608. Incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *BMC Software*, 83 S.W.3d at 794; *Stavinoha*, 126 S.W.3d at 608.

A trial court should make additional findings of fact only if they have some legal significance to an ultimate issue in the case. *Stuckey Diamonds, Inc. v. Harris Cty. Appraisal Dist.*, 93 S.W.3d 212, 213 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 255 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Summit asserts that because it requested additional findings of fact, we cannot presume the trial court relied upon proper legal principles or factual findings to support the challenged findings or conclusions. That is incorrect because Summit requested additional findings that are inconsistent with the trial court's judgment. This court noted long ago that "[t]he primary purpose for findings of fact is to assist the losing party in narrowing his issues on appeal by ascertaining the true basis for the trial court's decision." *Vickery*, 5 S.W.3d at 255. When a party requests findings contrary to the judgment, as Summit did, the court's failure to make such findings is consistent with its judgment. *See Vickery*, 5 S.W.3d at 256. The presumption of validity is not

rebutted by the court's failure to make findings contrary to its judgment. *Id*. With these standards in mind, we turn to Summit's issues presented on appeal.

### I. Summit did not conclusively establish that it suffered damages because of Enbridge Energy's purported delays.

In three issues, Summit contends that Enbridge Energy's purported delays in making advanced payments, negotiating with Wolseley, and providing valves constituted breach of the purchase order agreements and Summit incurred damages because of Enbridge Energy's delays.[4] We conclude that Summit has not shown as a matter of law that it suffered damages because of any delay by Enbridge Energy.[5]

### A. Contract Interpretation Principles

Summit's argument is based in part on its interpretation of the parties' agreements. Thus, we refer to the general principles concerning contract interpretation. *See Port of Houston Auth. of Harris Cty. v. Zachry Constr. Corp.*, 513 S.W.3d 543, 551 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

In construing a contract, we look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, No. 17-0332, 2019 WL 2668317, at *5 (Tex. June 28, 2019). We construe contracts de novo. *Id*. We give effect to the parties' agreement as expressed in the instrument. *Id*. We give the contract its plain, grammatical meaning unless it "would clearly defeat the parties' intentions." *Id*. If we determine that the contract's language is unambiguous—in other words, it can be given a certain or definite legal meaning or interpretation—we construe it as a matter of law. *Id*.

---

[4] In its appellate briefing, Summit refers to Enbridge Energy as "Enbridge" and Enbridge Gathering as "Enbridge Gathering."

[5] Summit also argues that the trial court erred in failing to award Summit attorney's fees. Because of our holding, we need not reach this issue.

Both parties contend that the agreements are unambiguous, but they disagree on the interpretation. Summit argues that Enbridge Energy was required to make 20% advanced payments at the time the purchase orders were issued. The Enbridge parties argue these payments instead were due within 30 days after invoicing.[6] Summit also argues that it incurred overhead for work outside the scope of the agreements caused by Enbridge Energy's delays. The Enbridge parties argue that any overhead incurred by Summit was included in the parties' "lump sum" agreements.

Summit asserts that we can look outside the four corners of the parties' agreements to interpret the parties' intentions. The supreme court recently reiterated that our primary duty in construing an unambiguous contract is to ascertain the intent of the parties from the language within the four corners of the instrument. *U.S. Shale Energy II, LLC v. Laborde Props., L.P.*, 551 S.W.3d 148, 151 (Tex. 2018). However, we consider the words used "in light of the facts and circumstances" surrounding the execution of the agreement. *Id*. We may consider these circumstances only when they inform but not when they contradict the instrument. *Id*.

Summit further contends that we can look to the bid proposals to support our interpretation of the purchase orders. We agree that we can consider the bid proposals because they are part of the parties' agreements. Texas's version of the Uniform Commercial Code applies to the sale of goods. *See* Tex. Bus. & Com. Code § 2.102. When a contract contains a mix of sales and services, the UCC applies if the sale of goods is the "dominant factor" or "essence" of the transaction. *Cont'l Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 787 (Tex. App.—Houston

---

[6] On appeal, the Enbridge parties again refer to themselves collectively as "Enbridge." Summit challenges only the trial court's contractual breach findings as to Enbridge Energy.

[14th Dist.] 2001, no pet.). The spools are without question goods as defined by the UCC. Tex. Bus. & Com. Code § 2.105. The UCC states that a "contract to sell" applies to not only a present sale of goods but also an agreement to sell goods at a future time. *Id*. § 2.106(a)-(b).

The purchase orders contemplate the sale of "Goods, and the services related thereto." Although Summit agreed to fabricate the spools, Enbridge ultimately contracted for a finished product. We conclude that the future sale of spools to Enbridge was the dominant factor of the transaction. *See Cont'l Casing Corp.*, 38 S.W.3d at 787-88. Accordingly, the UCC applies. *See id*.

Under the UCC, a contract is formed for the sale of goods by an offer and acceptance. Section 2.106 provides, in pertinent part: "Unless otherwise unambiguously indicated by the language or circumstances[,] an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Tex. Bus. & Com. Code § 2.206(a). Under section 2.207, additional terms in the acceptance of the offer are incorporated into the contract under most circumstances.[7] *Id*. § 2.207(b).

The parties agree that the purchase orders incorporated Summit's bid terms. We conclude that Summit's bid proposals are offers and the purchase orders are acceptances under the UCC. They together form the parties' agreements, and we may consider them both in our interpretation of the agreements. *See Peterson v. NCNB Tex. Nat'l Bank*, 862 S.W.2d 182, 183 (Tex. App.—Eastland 1993, writ denied) (noting a bid is an offer and a binding contract consists of an offer and acceptance).

---

[7] Additional terms do not become part of the contract when "(1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Tex. Bus. & Com. Code § 2.207(b). These exceptions do not apply here.

## B. Breach of Contract Claims

We turn to Summit's arguments regarding Enbridge Energy's purported breach of contract. A contractor is entitled to recover damages from an owner for losses due to a breach of contract based on delay and hindrance of the contractor's work only if the contractor proves (1) that its work was delayed or hindered, (2) that it suffered damages because of the delay or hindrance, and (3) that the owner was responsible for the act or omission that caused the delay or hindrance. *Zachry Constr. Corp.*, 513 S.W.3d at 560.

**Advanced Payments**. Summit argues that the delay in making the second advanced payment resulted in damages to Summit. The Enbridge parties contend that they were not required to make the payment until within 30 days after invoicing by Summit. Summit's bid proposals and the purchase orders both specify that the payment terms were "net 30." In other words, under the purchase orders, invoices were to be paid "within thirty . . . days of receipt." However, the purchase orders also required a "20% advanced payment." The "net 30" requirement reflects the general rule requiring payment of all invoices within thirty days. However, the requirement of a 20% advanced payment suggests an exception to this rule.

Applying the plain, grammatical meaning of the adjective "advance," we note that it means "ahead of time or beforehand." *The American Heritage Dictionary* 81 (2d col. ed. 1991). We conclude "advanced" in the context of this sentence means what it says: the payment was due "ahead of time or beforehand," in other words, before the work started. Our holding is consistent with long-established precedent: no phrase, sentence, or section of a contract should be read in isolation and considered apart from the other provisions, and a specific contract provision controls over a general one. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). We conclude that Enbridge

11

Energy generally was required under the parties' agreements to make payments within 30 days of invoicing. However, Enbridge Energy was also required to make a 20% advanced payment at the outset of each agreement.

Summit submitted a change order request for $41,920 representing 640 work hours. Summit contends it had to extend its "overhead, equipment and facilities . . . an additional four weeks" because the second advanced payment was not made on time. But Summit does not point to any evidence in the record establishing that it suffered damages from this delay.

The second advanced payment was made on the date of Summit's first delivery deadline—July 13, 2012. Although Summit made that delivery on time, it contends the late payment nevertheless caused delays in production. Summit presented expert testimony that the purpose of an advanced payment is for the vendor to be able to buy equipment and materials for a project. Summit's expert testified that the payment should have been made at the outset of the parties' agreement. Despite this testimony, Summit presented no evidence linking this late payment to the purported "additional four weeks" needed to complete the project.

**Negotiation with Supplier, Delivery of Valves**. Summit also submitted change orders totaling $348,168.95 representing expenses Summit allegedly incurred due to the Enbridge parties' purported delays in negotiating with Wolseley and delivering valves late.[8]

Two days after the first purchase order was issued, Summit issued a $10,847.54 change order request based on an increase in Wolseley's materials price. Nearly two weeks after the first purchase order was issued, Summit submitted another change order request for a materials price increase from

---

[8] As discussed, Summit argued below that the delays were caused by both Enbridge parties and not just Enbridge Energy.

Wolseley of $87,113.10, which included the prior change order request amount of $10,847.54. Summit complains on appeal that Enbridge Energy negotiated with Wolseley between May 24 and June 7, 2012 to reduce the increased price from $87,113.10 to $44,365.22, which was paid. Summit contends, however, that its ability to perform was impaired because Summit "remained nearly idle" during the negotiations.

Summit points to no evidence in the record showing it incurred any expenses as a result of the negotiations with Wolseley. In fact, Summit's own expert testified that the Enbridge parties were "totally divorced from" the delay because it was caused by Summit's failure to honor the fixed price for the materials it originally had quoted. Moreover, the Enbridge parties presented evidence that Wolseley shipped the materials on schedule, so there is evidence from which the trial court could infer the negotiations did not cause any damages to Summit.[9]

Summit also contends that Enbridge Energy delivered valves late, resulting in additional costs borne by Summit outside the scope of the parties' agreements. Whether most of the valves were delivered late resulting in damages to Summit was hotly contested at trial.[10]

Summit submitted a change order request for the first phase of the project for $118,949 in "manhours" with regard to 81 spools that purportedly "were handled multiple times during the process of waiting for the valves to show up." Summit began fabricating the spools in May 2012, and the Enbridge parties began

---

[9] This evidence is in a letter from a Wolseley representative admitted at trial, stating: "[Our supplier] was able to reduce the prices and deliver most of the items, for the first release in time. Whatever they could not deliver or reduce the prices on, we supplied those items from our stocks."

[10] The Enbridge parties presented evidence that many of the valves were delivered well in advance of the time the spools had to be ready.

shipping valves to Summit the same month. Summit asserted that it had fabricated certain spools, but then had to wait on the valves, causing Summit to pay for 1,399.4 extra "manhours." Summit used an estimating program to arrive at that number of hours but did not keep records of the actual number of extra hours purportedly paid. The first phase of the project called for 195 fabricated spools to be delivered by July 13, 2012. By June 20, 2012, Summit had received all the valves required for the first phase. The first spool delivery was on time.

Six weeks into the project, Earl Carpenter, a representative from IAG, was at the Summit facility managing the materials most of the time. He testified that the shop was never at a standstill awaiting delivery of valves to finish fabrication. Summit likewise never reported to IAG that there was a hold on fabrication due to the absence of valves. Another representative from IAG, Kenneth Neumann, testified that if Summit had reported the valves were not there on time, they would have been shipped out.

At one point, Summit notified Carpenter that "a couple . . . valves which [Summit] should have had in their possession" were missing. Carpenter told Summit that the valves had been shipped to Summit. The clear implication was that Summit somehow misplaced the valves, but Carpenter asked Summit to "go ahead and ship the spools without the valves installed." Carpenter told Neumann via email that a change order had been justified for Summit "to re-handle 81 spools" to add valves. He noted, however, that the amount of the requested change order was based on Summit's estimating program. Carpenter later testified that IAG agreed the late shipment of valves "would generate a certain amount of a . . . valid change order," but he said IAG approved a lesser amount, "like 40 something thousand dollars."

Another IAG representative conceded in deposition testimony admitted at

14

trial that "at least in some way . . . the cost to Summit increased" because the valves were not timely delivered. On cross-examination during trial, he testified that "the valves were not late," but he then agreed with Summit's counsel that not all of the valves were "available as needed." He also admitted that double handling the spools could increase costs.

A representative of the Enbridge parties conceded at trial that there were valve delays, but he did not agree that the delays "impacted Summit's ability to efficiently produce spools." He stated that the dispute between the parties was over the amount of the $118,949 change order. When asked whether missing parts can disrupt a fabricator's assembly line process, he responded, "It can." He ultimately stated, "My belief is . . . that there were costs on both sides—costs to Enbridge and costs to Summit. How it nets out, I truly do not know. That is the additional documentation that I was looking for [from Summit.]" He said after meeting with Summit, "it was determined that we did not see any evidence that we owed additional money to Summit." The trial court, as the factfinder, was entitled to weigh this conflicting testimony regarding whether the valves were late and whether late delivery of the valves resulted in additional expenses to Summit. *See City of Keller*, 168 S.W.3d at 819.

While Summit used an estimating program to arrive at the 1,399.4 hours purportedly expended handling the spools multiple times, the Enbridge parties, using the same estimating program, presented evidence that such work, if needed, would amount to only 96 hours for a total of $3,300. But the Enbridge parties did not concede that they owed Summit even this lesser amount.

Summit submitted three more change orders for more expenses allegedly incurred based on purported delays. These change orders were based on delays purportedly caused by the negotiations with Wolseley and "late delivery of

15

valves," resulting in "extra manhours," a 15% loss of productivity, and overtime incurred by Summit's vendor in testing the spools. The first of these requested change orders references the Wolseley negotiation and purported late delivery of valves and requests a total of $82,846.37. The second requested change order merely states that the vendor "was also required to work overtime." The final of these requested change orders states that the delays "created a loss of 33 scheduled work days."

Summit points to evidence that the valves arrived on a rolling basis and not all at the outset of the project, but the Enbridge parties presented evidence that they were not required to deliver the valves all at once because the spools were being fabricated on a rolling basis. The fact that the valves were delivered periodically during the fabrication process does not conclusively demonstrate that Summit was damaged. The Enbridge parties, moreover, accepted Summit's late delivery of spools after the project deadlines had passed, so the trial court could infer that Summit did not suffer damages by delivering the spools late.

Summit's expert testified that the delays prevented Summit from taking on other projects. The Enbridge parties' counsel argued this testimony regarding potential damage to Summit was speculative. The expert testified it was an approximation based on an estimated success rate for bids by Summit. We defer to the trial court to weigh the credibility of this evidence. *See id*.

Although the trial court was free to infer delays were caused by Enbridge Energy, the evidence also shows that Summit had a small shop, which resulted in difficulties handling and storing the spools and disorganization. The trial court could have inferred that Summit was not capable of handling a job of this magnitude given the size of its facilities and its workforce. Summit presumably took these factors into consideration when bidding the project. Thus, the trial court

could have inferred that the delays were not caused by Enbridge Energy but instead were caused by Summit's inability to handle a large project and by its own shortfalls in the bidding process or that any delays caused by Enbridge Energy did not cause Summit damage.[11] It was within the trial court's province as factfinder to find that any extra expenses incurred by Summit were not caused by Enbridge Energy's delays, if any. The parties presented conflicting evidence on this issue. Moreover, Summit had the burden to prove not only that it incurred damages but also the amount of its damages. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) ("[W]hether to award damages and how much is uniquely within the factfinder's discretion."). The trial court, as the factfinder, was entitled to weigh the credibility of Summit's evidence in support of its claim for damages and find it lacking.

**Scope of the Agreements**. Summit argues that it incurred expenses outside of the scope of the parties' agreements resulting from Enbridge's delays. The Enbridge parties argue that all expenses incurred by Summit were included in the scope of the agreements. The bid proposals, referred to explicitly as "Lump Sum proposal[s]," included "overtime," but also specified that "[a]ny down time [would] be handled on a Time and Material basis." "Extra Work" was to be billed for materials at cost plus 15% and labor at $85 per hour. Miller testified that overtime was to be paid on a "time and material" basis if Summit had to wait for the Enbridge parties to supply valves. However, the bid proposals do not expressly restrict the amount of overtime. Summit presented evidence that only "standard

---

[11] Given these facts, this is not a situation in which the factfinder ignored the uncontroverted fact of an injury and denied recovery. *See Schwartz v. Pinnacle Commc'ns*, 944 S.W.2d 427, 436 (Tex. App.—Houston [14th Dist.] 1997, no writ) ("[W]here the evidence of an injury is uncontroverted, the fact finder may determine the extent of injury and the appropriate amount of damages to be awarded based on the facts, but it may not ignore uncontroverted evidence by completely denying recovery.").

overtime" was included in the bids but did not present evidence of what the phrase "standard overtime" means. Presuming without deciding that the parties' agreement included "down time" to be paid by Summit as overtime, we conclude Summit did not prove as a matter of law that it incurred damages resulting from any purported delays by Enbridge.

**Conclusion**. Considering the conflicting evidence presented at trial and deferring to the trial court as factfinder as we must, we conclude Summit has not established as a matter of law that Enbridge Energy's failure to make an advanced payment on time caused damages to Summit. Similarly, Summit has not conclusively demonstrated that Enbridge Energy delayed the project by negotiating with Wolseley. Summit further has not conclusively shown it suffered damages from any delays by Enbridge Energy. Viewing the evidence in the light most favorable to the findings, we conclude that that the evidence was legally sufficient to support the trial court's findings and judgment. We overrule Summit's issues challenging the trial court's findings on breach of contract.

## II.    Summit's quantum meruit claim is precluded by express contract.

Summit also challenges the trial court's conclusion that its quantum meruit claim was barred by express contract. According to Summit, the services rendered in the requested change orders were not covered by the parties' agreement, and thus Summit was entitled to recover under quantum meruit for those services.

As a general rule, a party cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 737 (Tex. 2018). An exception applies when the reasonable value of work performed and accepted is not covered by the parties' contract. *Id*. We review de novo whether an express contract covers the services at issue. *Id*.

Several terms in the parties' agreements address Summit's ability to recover for overtime or change orders. Although the parties dispute the amount of overtime included in the parties' agreements, there is no dispute that the bid proposals included "overtime" and also specified that "[a]ny down time [would] be handled on a Time and Material basis." Moreover, the purchase orders state, "No claim for an increase in price or schedule extension shall be recognized unless such was authorized in advance and in writing by Purchaser." Thus, the agreements address the approval process for change orders. Accordingly, the parties' agreements contemplated overtime, extra work to be handled on a time and material basis, and change orders. *See, e.g., Gotham Ins. Co. v. Warren E & P, Inc.*, 455 S.W.3d 558, 563 (Tex. 2014) ("[T]hese clauses indicate that the contract addresses the matter at issue, and [the plaintiff] is limited to the contract rather than equity when determining liability."); *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 620 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("[W]hen a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a [quantum meruit] theory.").

Summit presents no other argument to reverse the judgment in favor of Enbridge Energy. Additionally, Summit does not argue that Enbridge Gathering is not a party to the contracts. Thus, Summit presents no other ground on which to reverse the judgment dismissing the quantum meruit claim against Enbridge Gathering. We overrule Summit's issue challenging the trial court's conclusion that the quantum meruit claim is precluded by express contract.[12]

### *Conclusion*

---

[12] Summit also contends that Enbridge Energy failed to prove its claims and defenses as a matter of law. Because we conclude that Summit did not prove as a matter of law that it suffered damages from any purported delays by Enbridge Energy, we need not reach this issue.

19

We affirm the judgment of the trial court.

/s/     Frances Bourliot
         Justice

Panel consists of Chief Justice Frost and Justices Jewell and Bourliot. (Frost, C.J., concurring).

20